[843 NE2d 125, 809 NYS2d 485]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT SHULMAN, Appellant.

Argued September 6, 2005; decided October 25, 2005

2

**POINTS OF COUNSEL**

*Legal Aid Society,* New York City (*Andrew C. Fine, Arthur H. Hopkirk, Denise Fabiano, Laura R. Johnson, Elon Harpaz, Joanne Legano Ross* and *Reed Smith* of counsel), for appellant. I. The evidence presented by the prosecution at the suppression hearing failed to establish the existence of probable cause for Robert Shulman's arrest, requiring suppression of all of his statements as the direct consequence of the unlawful arrest, and suppression of the items seized as the result of the execution of the warrant authorizing the search of Robert Shulman's home and Barry Shulman's car, since the warrant application was based on the illegally obtained statements. (*People v Abdullah,* 134 AD2d 503; *People v Wesley,* 83 NY2d 417; *People v Vandenbosch,* 216 AD2d 884; *People v Muggelberg,* 132 AD2d 988; *People v Centolella,* 61 Misc 2d 723; *People v McCreary,* 186 AD2d 1070; *People v Lifrieri,* 230 AD2d 754; *Frye v United States,* 293 F 1013; *People v Bouton,* 50 NY2d 130; *People v Dodt,* 61 NY2d 408.) II. The prosecution failed to establish beyond a reasonable doubt the voluntariness of the admissions extracted by rotating teams of police interrogators from a deeply disturbed, fragile, and sleep-deprived Robert Shulman in the course of nearly continuous, round-the-clock questioning that successfully exploited his psychological vulnerability. (*People v Anderson,* 42 NY2d 35; *Rogers v Richmond,* 365 US 534; *People v Huntley,* 15 NY2d 72; *Lego v Twomey,* 404 US 477; *Schneckloth v Bustamonte,* 412 US 218; *Colorado v Connelly,* 479 US 157; *People v Mateo,* 2 NY3d 383; *Hill v Anderson,* 300 F3d 679; *Nickel v Hannigan,* 97 F3d 403; *United States v Sablotny,* 21 F3d 747.) III. (A) The police's failure to videotape the entire incommunicado custodial interrogation of Robert Shulman at the police station violated his rights under New York's Due Process Clause; (b) in the alternative, the hearing court should have considered the failure to electronically record the station house interrogation as a factor in determining that the prosecu-

tion failed to meet its burden of proving beyond a reasonable doubt that the resulting statements were voluntary. (*Ashcraft v Tennessee,* 322 US 143; *California v Trombetta,* 467 US 479; *People v Lucarano,* 61 NY2d 138; *People v Martin,* 294 AD2d 850; *People v Falkenstein,* 288 AD2d 922; *People v Ferguson,* 285 AD2d 901; *People v Owens,* 185 Misc 2d 661; *People v Bartolomeo,* 53 NY2d 225; *Miranda v Arizona,* 384 US 436; *People v P. J. Video,* 68 NY2d 296.) IV. The trial court violated Robert Shulman's constitutional rights to counsel, due process of law, and a reliable capital sentencing determination when it overrode defense counsel's strategic decision to forgo a challenge to a prospective juror who believed appellant was guilty, but whose attitudes toward sentencing were favorable to the defense. (*People v LaFontaine,* 92 NY2d 470; *People v DeGina,* 72 NY2d 768; *Pierson v People,* 79 NY 424; *People v Romero,* 91 NY2d 750; *People v Goodfriend,* 64 NY2d 695; *People v Perez,* 65 NY2d 154; *People v Bradley,* 88 NY2d 901; *People v Sterling,* 210 AD2d 358; *People v Tortorici,* 92 NY2d 757; *Strickland v Washington,* 466 US 668.) V. The trial court erred when it denied the defense's challenge for cause to a juror who never provided unequivocal assurances that her opinion as to Robert Shulman's guilt would not influence her verdict and that she would render an impartial verdict based solely on the evidence. (*People v Johnson,* 94 NY2d 600; *People v Torpey,* 63 NY2d 361; *People v Blyden,* 55 NY2d 73; *People v Biondo,* 41 NY2d 483; *People v Culhane,* 33 NY2d 90; *People v Wilmarth,* 156 NY 566; *People v Nicholas,* 98 NY2d 749; *Crawford v Bounds,* 395 F2d 297; *Witherspoon v Illinois,* 391 US 510; *Wardius v Oregon,* 412 US 470.) VI. In a case that heavily relied upon the testimony of detectives, the trial court erred when it denied the defense's challenge for cause to a juror who stated on his questionnaire that he believed that police officers were more likely to tell the truth than other witnesses, reaffirmed that opinion when questioned in open court, and was never adequately rehabilitated. (*People v Johnson,* 94 NY2d 600; *People v Camacho,* 280 AD2d 609; *People v White,* 275 AD2d 913; *People v Culhane,* 33 NY2d 90; *People v Torpey,* 63 NY2d 361; *People v Blyden,* 55 NY2d 73; *People v Nicholas,* 98 NY2d 749; *People v Chambers,* 97 NY2d 417; *People v Bludson,* 97 NY2d 644.) VII. The trial court erroneously denied the defense's challenge for cause to a prospective juror whose brother-in-law was a Suffolk County homicide prosecutor who attended a meeting about the evidence in this case with the lead trial prosecutor and witnesses shortly before Robert Shulman's arrest. (*People v Branch,* 46 NY2d 645; *Hasenbein v*

*Siebert,* 83 AD2d 875, 56 NY2d 853; *People v Lynch,* 95 NY2d 243; *People v Whittington,* 267 AD2d 486; *People v McDermott,* 180 Misc 247; *People v Maddaus,* 17 NY2d 625; *People v Biondo,* 41 NY2d 483; *People v Culhane,* 33 NY2d 90; *People v Torpey,* 63 NY2d 361.) VIII. The trial court erroneously denied the defense's challenge for cause to a prospective juror who "violated a direct court order" by reading a newspaper article about the case between filling out his questionnaire and his individual interview two months later. (*People v Harris,* 98 NY2d 452; *People v Berg,* 59 NY2d 294; *People v Davis,* 58 NY2d 1102; *People v Mims,* 278 AD2d 822; *People v Baker,* 277 AD2d 185; *People v Guzman,* 76 NY2d 1; *People v Boulware,* 29 NY2d 135; *People v Montada,* 249 AD2d 72; *People v Torres,* 164 AD2d 923; *People v Ahmed,* 66 NY2d 307.) IX. The trial court's denial of the defense's challenge for cause requires a new trial because a juror's repeated lack of candor in giving sworn answers during jury selection rendered him unfit to serve at either the guilt or penalty phase; in the alternative, the failure to grant the challenge to this juror, a corrections officer, after he wrote that life imprisonment without possibility of parole meant, "3 hots and a cot, free medical, $50[,]000 a year wasted," requires vacatur of the death sentence. (*People v Watson,* 216 NY 565; *People v Culhane,* 33 NY2d 90; *People v Watson,* 216 NY 565; *Blair v Armontrout,* 916 F2d 1310; *Brooks v Kemp,* 762 F2d 1383, 478 US 1016, 809 F2d 700, 483 US 1010; *People v Biondo,* 41 NY2d 483; *People v Torpey,* 63 NY2d 361; *People v Wilmarth,* 156 NY 566; *People v Johnson,* 94 NY2d 600; *People v Cahill,* 2 NY3d 14.) X. The trial court erred when it denied the defense's challenge for cause to a juror who was unable to properly exercise the sentencing discretion given to jurors in a capital case due to (1) his willingness to consider, as a factor in favor of a death sentence, his belief that a death sentence might be more merciful than life in prison, despite the Legislature's policy determination that death is the more severe sentence; and (2) his emphasis on legally inadmissible pleas for mercy from the victims' families as a form of mitigation that might persuade him to forgo imposing a death sentence for multiple intentional murders. (*People v Cahill,* 2 NY3d 14; *People ex rel. Lonschein v Warden of Queens House of Detention for Men,* 43 Misc 2d 109, 15 NY2d 663; *People v Mencher,* 13 NY2d 148; *Shepherd v People,* 25 NY 406; *Blair v Armontrout,* 916 F2d 1310; *People v Guzman,* 76 NY2d 1; *People v Mims,* 278 AD2d 822; *People v Baker,* 277 AD2d 185; *Morgan v Illinois,* 504 US 719; *People v Culhane,* 33 NY2d 90.) XI. The trial court violated Robert Shul-

man's right to a constitutionally selected jury and his full complement of peremptory challenges when it erroneously denied his challenge for cause to a juror who indicated that he would always impose the death penalty under the facts of this case. (*People v Harris,* 98 NY2d 452; *Wainwright v Witt,* 469 US 412; *People v Cahill,* 2 NY3d 14; *Sheppard v Maxwell,* 384 US 333; *People v Arnold,* 96 NY2d 358; *Morgan v Illinois,* 504 US 719; *Antwine v Delo,* 54 F3d 1357; *United States v Flores,* 63 F3d 1342; *People v Johnson,* 94 NY2d 600.) XII. In a case in which the voluntariness of appellant's statements was in dispute, the trial court erroneously restricted the defense from questioning a prospective juror who was a police detective about whether he had ever seen a colleague conduct "an interview more forcibly than what you believe was appropriate," and thereby prevented the defense from laying the foundation for a challenge for cause and interfered with the informed exercise of peremptory challenges. (*Matter of Anonymous Attorneys,* 41 NY2d 506; *Matter of Johnson v Pataki,* 91 NY2d 214; *People v Boulware,* 29 NY2d 135; *People v LaFontaine,* 92 NY2d 470; *People v Romero,* 91 NY2d 750; *Gardner v Broderick,* 392 US 273; *Matter of Matt v Larocca,* 71 NY2d 154; *People v Cronin,* 60 NY2d 430; *People v Catten,* 69 NY2d 547; *People v Baker,* 64 NY2d 1027.) XIII. The court abused its discretion and denied Robert Shulman his right to a fair trial when it refused to voir dire the jury after a newspaper article in a major daily publication revealed that Mr. Shulman was a suspect in at least two additional murders. (*Morgan v Illinois,* 504 US 719; *Irvin v Dowd,* 366 US 717; *People v Moore,* 42 NY2d 421; *People v Genovese,* 10 NY2d 478; *People v Costello,* 104 AD2d 947; *People v Swan,* 130 AD2d 6; *People v Velez,* 222 AD2d 539; *People v Sullivan,* 167 AD2d 564; *People v Mordino,* 58 AD2d 197; *People v Mott,* 94 AD2d 415.) XIV. The "similar fashion" aggravating factor, which as here interpreted permitted the jury to sentence Robert Shulman to death on the sole basis that he had committed three murders that were "somewhat like" one another, is unconstitutionally vague. (*People v Mateo,* 175 Misc 2d 192; *Godfrey v Georgia,* 446 US 420; *Espinosa v Florida,* 505 US 1079; *Maynard v Cartwright,* 486 US 356; *Ring v Arizona,* 536 US 584; *Clemons v Mississippi,* 494 US 738; *People v Nelson,* 69 NY2d 302; *Tuilaepa v California,* 512 US 967; *People v Lombardo,* 61 NY2d 97; *People v Reed,* 265 AD2d 56.) XV. The trial court's instructions on the "similar fashion" element of the serial murder charge improperly invited the jury to conclude that "similar fashion" could be proven by acts committed *after* the killings

were complete, undermining the reliability of the verdict and inviting the prosecutor's reliance on highly prejudicial nonstatutory aggravation in seeking a sentence of death. (*People v Hedgeman,* 70 NY2d 533; *People v P. J. Video,* 68 NY2d 296; *People v Case,* 42 NY2d 98; *People v Gottlieb,* 36 NY2d 629; *People v Cahill,* 2 NY3d 14; *Godfrey v Georgia,* 446 US 420; *People v Reed,* 265 AD2d 56; *Braschi v Stahl Assoc. Co.,* 74 NY2d 201; *United States v Whitridge,* 197 US 135; *People v Flynn,* 79 NY2d 879.) XVI. The trial court's dismissal of the two indicted counts of depraved indifference murder, over defense objection, was an abuse of discretion, or alternatively, an improvident exercise of discretion, where a reasonable view of the evidence warranted submission of those counts, it exposed Robert Shulman to an unwarranted risk of a capital conviction, it deprived Mr. Shulman of a fair and reliable determination by the jury of his mental culpability, and it deprived Mr. Shulman of his right to present his defense. (*Keeble v United States,* 412 US 205; *People v Green,* 56 NY2d 427; *People v Moran,* 246 NY 100; *People v Cummings,* 274 NY 336; *People v Draper,* 278 App Div 298; *People v Kulakov,* 278 AD2d 519; *People v Davis,* 165 AD2d 610; *People v Lopez,* 79 AD2d 531; *People v Boettcher,* 69 NY2d 174; *People v Barona,* 69 AD2d 797.) XVII. The trial court erred when it denied the defense's request for a jury instruction that the failure of the police to arraign Robert Shulman "without unnecessary delay" was a factor for the jury to consider in deciding whether his statements were involuntary. (*People v Alex,* 265 NY 192; *People ex rel. Maxian v Brown,* 77 NY2d 422; *People v Holland,* 48 NY2d 861; *Jackson v Denno,* 378 US 368; *People v Huntley,* 15 NY2d 72; *People v Lovello,* 1 NY2d 436; *People v Elmore,* 277 NY 397; *People v Ramos,* 99 NY2d 27; *Lego v Twomey,* 404 US 477.) XVIII. Because Robert Shulman went to trial under a statutory scheme that this Court, in *Matter of Hynes v Tomei* (92 NY2d 613 [1998]), declared unconstitutional, he is entitled to a new trial at which the prosecution would be barred from seeking a death sentence. (*United States v Jackson,* 390 US 570; *People v Mateo,* 2 NY3d 383; *People v Harris,* 98 NY2d 452; *Roseboro v North Carolina,* 403 US 948; *Sanders v North Carolina,* 403 US 948; *Williams v North Carolina,* 403 US 948; *Atkinson v North Carolina,* 403 US 948; *Parker v North Carolina,* 397 US 790; *People v Edwards,* 96 NY2d 445; *People v Smith,* 63 NY2d 41.) XIX. The standardless discretion granted to prosecutors to file death notice pursuant to CPL 250.40 leads to widely varying policies for seeking the death penalty from county to county in New York, in violation of the constitutional

guarantee of due process and the ban on cruel and unusual punishment; in the alternative, when, as here, venue to prosecute a first-degree murder case lies in more than one county and the county where a killing occurred is not in dispute, the unintended interaction of CPL 20.40 (2) (b) and 250.40 arbitrarily and unconstitutionally allows the prosecutor of a county with a minimal connection to the crime to seek a death sentence, even though the District Attorney of another county with a more direct interest in the outcome of the prosecution might, applying that community's standards, choose not to pursue a capital prosecution. (*People v Harris,* 98 NY2d 452; *Matter of Hynes v Tomei,* 92 NY2d 613; *Gregg v Georgia,* 428 US 153; *McCleskey v Kemp,* 481 US 279; *People v Cahill,* 2 NY3d 14; *Deal v United States,* 508 US 129; *Matter of Nicholas v Kahn,* 47 NY2d 24; *Matter of Big Apple Food Vendors' Assn. v Street Vendor Review Panel,* 90 NY2d 402; *Caldwell v Mississippi,* 472 US 320; *Woodson v North Carolina,* 428 US 280.) XX. Where the prosecution issued a grand jury subpoena for Robert Shulman's records from his childhood psychologist in violation of the psychologist-patient privilege, and for the improper purpose of determining whether or not to seek the death penalty, Mr. Shulman was deprived of a fair and reliable sentencing determination, as well as due process of law, and this Court should vacate the death sentence and strike the death notice. (*People v Currier,* 221 AD2d 805; *People v Natal,* 75 NY2d 379; *Perry v Fiumano,* 61 AD2d 512; *Lightman v Flaum,* 97 NY2d 128; *People v Wilkins,* 65 NY2d 172; *People v Sinski,* 88 NY2d 487; *Matter of Grand Jury Investigation of Onondaga County,* 59 NY2d 130; *Matter of Grand Jury Investigation in N.Y. County,* 98 NY2d 525; *People v Edney,* 39 NY2d 620; *Matter of Charles RR.,* 166 AD2d 763.) XXI. New York's statutorily mandated deadlock instruction is unconstitutionally coercive and undermines the reliability of capital sentencing. (*People v Cahill,* 2 NY3d 14; *Lowenfield v Phelps,* 484 US 231; *Morris v Woodford,* 273 F3d 826, 537 US 941; *Penry v Johnson,* 532 US 782; *Penry v Lynaugh,* 492 US 302; *Jones v United States,* 527 US 373; *Simmons v South Carolina,* 512 US 154; *California v Ramos,* 463 US 992; *Allen v United States,* 164 US 492; *People v Faber,* 199 NY 256.) XXII. Robert Shulman was deprived of his rights to due process, to present a defense, to confrontation and to a reliable sentencing determination when, at the pre-penalty phase competency hearing, the trial court (a) precluded Mr. Shulman's expert from testifying on the minimum standards necessary to determine client competency at the capital penalty phase, and unduly

restricted the cross-examination of the court-appointed psychiatrists, and (b) erroneously ruled that Mr. Shulman was competent to proceed with the penalty phase. (*Cooper v Oklahoma,* 517 US 348; *Medina v California,* 505 US 437; *People v Garrasi,* 302 AD2d 981; *People v Williams,* 85 NY2d 945; *Dusky v United States,* 362 US 402; *Johnson v Keane,* 974 F Supp 225; *United States v Hemsi,* 901 F2d 293; *United States v Cronic,* 466 US 648; *People v Tortorici,* 92 NY2d 757; *People v Christopher,* 65 NY2d 417.) XXIII. Robert Shulman was deprived of his right to a fair and reliable sentencing determination by the trial court's denial of his motion for a separate sentencing jury, where the penalty phase jury could not have put aside its overwhelming emotional response to the cumulative effect of numerous horrifying photographs of the victims, in violation of the New York death penalty statute. (*Penry v Lynaugh,* 492 US 302; *Mann v Oklahoma,* 488 US 877; *Thompson v Oklahoma,* 487 US 815; *People v Stevens,* 76 NY2d 833.) XXIV. Robert Shulman was deprived of his right to a fair and reliable sentencing determination by the trial court's refusal to discharge a juror who had learned of Mr. Shulman's postverdict suicide attempt, thereby unconstitutionally decreasing the juror's sense of responsibility for deciding to impose the death penalty. (*People v Harris,* 98 NY2d 452; *Caldwell v Mississippi,* 472 US 320; *Eddings v Oklahoma,* 455 US 104; *Lockett v Ohio,* 438 US 586; *Gardner v Florida,* 430 US 349; *Woodson v North Carolina,* 428 US 280; *Morgan v Illinois,* 504 US 719; *Turner v Murray,* 476 US 28; *Fetterly v Paskett,* 997 F2d 1295; *People v Blyden,* 55 NY2d 73.) XXV. By precluding testimony about Robert Shulman's prospective adjustment to prison if he were sentenced to life in prison without parole, the court deprived Mr. Shulman of his right to introduce relevant mitigating evidence, subjecting him to cruel and unusual punishment and denying him due process of law, and then further improperly and arbitrarily precluded the testimony of James Park, a corrections expert, denying Mr. Shulman his right to present witnesses of his own choosing in his defense. (*Skipper v South Carolina,* 476 US 1; *Eddings v Oklahoma,* 455 US 104; *Lockett v Ohio,* 438 US 586; *Chambers v Mississippi,* 410 US 284; *Jenkins v McKeithen,* 395 US 411; *Washington v Texas,* 388 US 14; *People v Gilliam,* 37 NY2d 722, 45 AD2d 744; *People v Forbes,* 87 AD2d 829; *People v McClinton,* 75 AD2d 900; *People v Arroyo,* 162 AD2d 337.) XXVI. The trial court's refusal to put mitigating factors on the verdict sheet that told the full story of Robert Shulman's history of mental illness unfairly hamstrung the defense and prevented

jurors from arriving at a reliable sentencing determination. (*Gregg v Georgia,* 428 US 153; *Lockett v Ohio,* 438 US 586; *Eddings v Oklahoma,* 455 US 104; *People v DeGina,* 72 NY2d 768; *People v Bradley,* 88 NY2d 901; *People v Sterling,* 210 AD2d 358; *Herring v New York,* 422 US 853; *People v Luis,* 189 AD2d 657; *People v Reina,* 94 AD2d 727; *People v Owens,* 69 NY2d 585.) XXVII. The prosecutor's pervasive guilt-and-penalty-phase misconduct, which included raising the specter that Robert Shulman might receive a pardon if sentenced to life without parole and invoking scripture to argue that Jesus supported the death penalty, deprived Mr. Shulman of a fair and impartial sentencing determination. (*Berger v United States,* 295 US 78; *Sawyer v Smith,* 497 US 227; *Lesko v Lehman,* 925 F2d 1527; *People v Kurtz,* 51 NY2d 380; *People v Rivera,* 74 AD2d 857; *Zant v Stephens,* 462 US 862; *People v Nevedo,* 202 AD2d 183; *People v Arthur,* 175 Misc 2d 742; *People v Johnson,* 284 NY 182; *People v Sherwood,* 271 NY 427.) XXVIII. The trial court's imbalanced and inaccurate penalty-phase instructions resulted in an unreliable verdict of death. (*Penry v Lynaugh,* 492 US 302; *Furman v Georgia,* 408 US 238; *Johnson v Mississippi,* 486 US 578; *Tuilaepa v California,* 512 US 967; *Gregg v Georgia,* 428 US 153; *Lockett v Ohio,* 438 US 586; *Taylor v Kentucky,* 436 US 478; *People v Antommarchi,* 80 NY2d 247; *Adams v Texas,* 448 US 38; *California v Brown,* 479 US 538.) XXIX. The death sentence imposed was against the weight of the evidence. (*Penry v Lynaugh,* 492 US 302; *Aldridge v Dugger,* 925 F2d 1320; *Skipper v South Carolina,* 476 US 1; *Simmons v South Carolina,* 512 US 154; *Franklin v Lynaugh,* 487 US 164; *People v Smith,* 63 NY2d 41; *People v Bleakley,* 69 NY2d 490.) XXX. New York's death penalty constitutes cruel and unusual punishment because of (a) the racial disparities and inevitable arbitrariness of the statute, (b) the real and intolerable risk of executing innocent people, and (c) its failure to contribute to any acceptable goal of punishment. (*People v Cahill,* 2 NY3d 14; *United States v Sampson,* 275 F Supp 2d 49; *United States v Quinones,* 205 F Supp 2d 256, 313 F3d 49; *United States v Ferebe,* 332 F3d 722; *McCleskey v Kemp,* 481 US 279; *People v Kern,* 75 NY2d 638; *Godfrey v Georgia,* 446 US 420; *Matter of 303 W. 42nd St. Corp. v Klein,* 46 NY2d 686; *People v Goodman,* 31 NY2d 262; *Atkins v Virginia,* 536 US 304.) XXXI. New York's lethal injection procedures create a substantial risk of prolonged and torturous executions, and thus constitute cruel and unusual punishment. (*Campbell v Wood,* 18 F3d 662; *Gregg v Georgia,* 428 US 153; *Chaney v Heckler,* 718 F2d 1174, 470 US 821; *Fierro v Gomez,*

77 F3d 301; *Louisiana ex rel. Francis v Resweber,* 329 US 459; *Campbell v Wood,* 18 F3d 662; *Weems v United States,* 217 US 349; *People v Broadie,* 37 NY2d 100; *Lackey v Texas,* 514 US 1045; *Rupe v Wood,* 863 F Supp 1307, 93 F3d 1434.)

*Thomas J. Spota, District Attorney,* Riverhead (*Guy Arcidiacono, Glenn Green, Michael J. Miller, Steven A. Hovani, Anne E. Oh* and *Marion Tang* of counsel), for respondent. I. Defendant's arrest was supported by probable cause. (*People v Cameron,* 6 AD3d 546; *People v Simpson,* 5 AD3d 613; *People v Prochilo,* 41 NY2d 759; *People v Rios,* 11 AD3d 641; *Brinegar v United States,* 338 US 160; *People v Oden,* 36 NY2d 382; *People v Coffey,* 12 NY2d 443; *People v Bigelow,* 66 NY2d 417; *People v McRay,* 51 NY2d 594; *People v Carrasquillo,* 54 NY2d 248.) II. Defendant's statements followed the voluntary, knowing, intelligent waiver of his constitutional rights, were not the product of an unnecessary delay of arraignment, and were properly admitted at trial. (*People v Williams,* 62 NY2d 285; *People v Tarsia,* 50 NY2d 1; *Dickerson v United States,* 530 US 428; *People v Huntley,* 15 NY2d 72; *People v Edney,* 47 AD2d 906; *People v Anderson,* 42 NY2d 35; *Clewis v Texas,* 386 US 707; *Fikes v Alabama,* 352 US 191; *People v Mateo,* 2 NY3d 383; *Arizona v Fulminante,* 499 US 279.) III. Contemporaneous recording of a defendant's confession is not mandated either by the United States Constitution or the New York State Constitution. (*People v Falkenstein,* 288 AD2d 922; *People v Owens,* 185 Misc 2d 661; *People v Martin,* 294 AD2d 850; *People v Combest,* 4 NY3d 341; *California v Trombetta,* 467 US 479; *People v Alvarez,* 70 NY2d 375; *People v Scott,* 79 NY2d 474; *People v Vilardi,* 76 NY2d 67; *People v Berk,* 88 NY2d 257.) IV. The trial court properly exercised its discretionary control over jury selection when it removed prospective juror P.G. on its own motion after having denied the prosecution's cause challenge. (*People v Mower,* 97 NY2d 239; *People v Knowles,* 88 NY2d 763; *People v LaFontaine,* 92 NY2d 470; *People v Maher,* 89 NY2d 456; *United States v Flores,* 63 F3d 1342; *People v Boozer,* 298 AD2d 261; *People v Redd,* 272 AD2d 168; *People v Gayle,* 238 AD2d 133; *People v Wilson,* 211 AD2d 136, *affd sub nom. People v Vargas,* 88 NY2d 363; *People v Boulware,* 29 NY2d 135.) V. The trial court correctly denied defendant's cause challenge to a prospective juror who gave unequivocal assurances of impartiality regarding her belief in defendant's innocence. (*People v Williams,* 63 NY2d 882; *People v Johnson,* 94 NY2d 600; *People v Torpey,* 63 NY2d 361; *People v Biondo,* 41 NY2d 483; *People v Pagan,* 191 AD2d 651; *People v Zanghi,* 256 AD2d 1120; *People v Baskett,* 250 AD2d 774; *People*

*v Bosket,* 168 AD2d 833.) VI. The trial court correctly denied defendant's cause challenge to a juror who plainly stated that he could follow the trial court's instructions regarding police testimony. (*People v Thigpen,* 277 AD2d 261; *People v Zachary,* 260 AD2d 514; *People v Harris,* 247 AD2d 630; *People v Chambers,* 97 NY2d 417; *People v Arnold,* 96 NY2d 358.) VII. Defendant did not preserve his current claim that prospective juror J.C. should have been excused pursuant to CPL 270.20 (1) (c) and, in any event, the trial court correctly decided that issue. (*People v Mower,* 97 NY2d 239; *People v Knowles,* 88 NY2d 763; *People v Branch,* 46 NY2d 645; *People v Stafford,* 302 AD2d 325; *People v Pickren,* 284 AD2d 727; *People v Colon,* 127 AD2d 678, 71 NY2d 410; *People v Johnson,* 261 AD2d 125; *People v Stamps,* 254 AD2d 507; *People v De Rosa,* 187 AD2d 980; *People v Williams,* 243 AD2d 833.) VIII. The trial court correctly denied a cause challenge to a prospective juror who unknowingly failed to follow one of the trial court's instructions. (*People v Rosado,* 254 AD2d 99; *People v Radtke,* 219 AD2d 739; *People v Johnson,* 217 AD2d 667; *People v Pineda,* 269 AD2d 610; *People v Robertson,* 217 AD2d 989; *People v Clarke,* 168 AD2d 686; *People v Brown,* 136 AD2d 1; *People v Velez,* 222 AD2d 539.) IX. The trial court correctly denied the cause challenge to prospective juror S.C. (*People v Williams,* 63 NY2d 882; *People v Cahill,* 2 NY3d 14; *People v LaValle,* 3 NY3d 88; *People v Blyden,* 55 NY2d 73; *People v Culhane,* 33 NY2d 90; *People v Colon,* 71 NY2d 410; *People v Stafford,* 302 AD2d 325; *People v Jones,* 299 AD2d 283.) X. The trial court correctly denied the cause challenge to prospective juror C.R. (*People ex rel. Lonschein v Warden of Queens House of Detention for Men,* 43 Misc 2d 109, 15 NY2d 663.) XI. The trial court denied defendant's cause challenge to prospective juror G.M. because he would properly consider mitigation evidence. (*People v Harris,* 98 NY2d 452; *Sellers v Ward,* 135 F3d 1333; *United States v Chandler,* 996 F2d 1073; *People v Cahill,* 2 NY3d 14.) XII. The trial court did not improperly restrict defense counsel's voir dire of prospective juror D.R. (*People v Mower,* 97 NY2d 239; *People v Udzinski,* 146 AD2d 245; *People v Boulware,* 29 NY2d 135; *People v Walston,* 277 AD2d 593; *People v Dart,* 186 AD2d 905; *People v Jean,* 75 NY2d 744; *People v Gladstone,* 112 AD2d 592; *People v Harris,* 98 NY2d 452; *People v Porter,* 226 AD2d 275; *People v Hosier,* 132 App Div 146, 196 NY 506.) XIII. Given defendant's limited request, the court appropriately refused to interrogate seated jurors about their possible exposure to an ambiguous newspaper headline. (*People v Udzinski,* 146 AD2d 245, 74 NY2d 853; *People v Robinson,* 88

NY2d 1001; *People v Gray,* 86 NY2d 10; *People v Harris,* 98 NY2d 452; *People v Stephens,* 84 NY2d 990; *In re Murchison,* 349 US 133; *People v Moore,* 42 NY2d 421; *People v Testa,* 61 NY2d 1008; *People v Velez,* 222 AD2d 539; *People v Genovese,* 10 NY2d 478.) XIV. New York's "serial murder" aggravating factor is constitutional. (*People v Robinson,* 88 NY2d 1001; *People v Gray,* 86 NY2d 10; *People v Harris,* 98 NY2d 452; *People v Stephens,* 84 NY2d 990; *People v Kello,* 96 NY2d 740; *People v Bynum,* 70 NY2d 858; *Matter of Hynes v Tomei,* 92 NY2d 613; *Weems v United States,* 217 US 349; *Trop v Dulles,* 356 US 86; *People v Scalza,* 76 NY2d 604.) XV. The court's instruction on the "similar fashion" element of the serial murder charge was entirely proper. (*People v Robinson,* 88 NY2d 1001; *People v Gray,* 86 NY2d 10; *People v Harris,* 98 NY2d 452; *People v Stephens,* 84 NY2d 990; *People v Kello,* 96 NY2d 740; *People v Hedgeman,* 70 NY2d 533; *People v Cahill,* 2 NY3d 14; *Godfrey v Georgia,* 446 US 420; *People v Mateo,* 93 NY2d 327; *People v Alvino,* 71 NY2d 233.) XVI. The trial court properly dismissed the depraved indifference murder counts because no reasonable view of the evidence supported a conviction for reckless murder. (*People v Smith,* 260 AD2d 253; *People v Garcia,* 219 AD2d 669; *People v Johnson,* 87 NY2d 357; *People v Gallagher,* 69 NY2d 525; *People v Cole,* 233 AD2d 247; *People v Keefer,* 197 AD2d 915; *People v Pozo,* 261 AD2d 144; *People v Spears,* 271 AD2d 464; *People v Kulakov,* 278 AD2d 519.) XVII. The court's instructions adequately informed the jury how to assess the voluntariness of defendant's statements. (*People v Cefaro,* 23 NY2d 283; *People v Sears,* 9 AD3d 472; *People v Haywood,* 280 AD2d 282; *People v Medina,* 146 AD2d 344, *affd on other grounds sub nom. People v Bing,* 76 NY2d 331; *People v Boulware,* 29 NY2d 135; *People v Lovello,* 1 NY2d 436; *People v Schenandoah,* 10 AD2d 342; *People v Dairsaw,* 53 AD2d 698, 46 NY2d 739; *People v Kozicky,* 275 App Div 863; *People v Greaves,* 94 NY2d 775.) XVIII. This Court's holding in *Matter of Hynes v Tomei* (92 NY2d 613 [1998]) is not controlling in this case. (*United States v Jackson,* 390 US 570; *United States v Lutz,* 420 F2d 414; *People v Graves,* 85 NY2d 1024; *People v Spencer,* 219 AD2d 259; *People v Harris,* 98 NY2d 452; *Matter of Francois v Dolan,* 95 NY2d 33; *People v Mower,* 97 NY2d 239; *People v Van Dyne,* 12 AD3d 120; *Gregg v Georgia,* 428 US 153; *Lowenfield v Phelps,* 484 US 231.) XIX. The prosecutorial discretion provision of Criminal Procedure Law § 250.40 is constitutional under the United States and New York constitutions. (*People v Harris,* 177 Misc 2d 102, 98 NY2d 452; *People v Cahill,* 2 NY3d 14; *Gregg v Geor-*

*gia,* 428 US 153; *People v Parker,* 41 NY2d 21; *County Court of Ulster Cty. v Allen,* 442 US 140; *People v Drayton,* 39 NY2d 580; *Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761; *United States v Mazurie,* 419 US 544; *Matter of Hynes v Tomei,* 92 NY2d 613; *People v Broadie,* 37 NY2d 100.) XX. The People properly issued subpoenas for certain records and the grand jury proceeding was not defective. (*People v Natal,* 75 NY2d 379; *People v Carkner,* 213 AD2d 735; *People v Currier,* 221 AD2d 805; *People v Sinski,* 88 NY2d 487, 1018; *Silagy v Peters,* 905 F2d 986; *Stewart v Peters,* 878 F Supp 1139; *People v Davis,* 43 NY2d 17; *Gregg v Georgia,* 428 US 153.) XXI. Defendant waived any challenge to the court's actual deadlock instruction, which is, in any event, distinguishable from that struck down in *People v LaValle* (3 NY3d 88 [2004]). (*People v Mills,* 1 NY3d 269; *People v Ford,* 62 NY2d 275; *People v Richardson,* 88 NY2d 1049; *People v Williams,* 260 AD2d 799; *People v Shaffer,* 66 NY2d 663; *People v Forgione,* 134 AD2d 514; *Simmons v South Carolina,* 512 US 154; *People v McIntosh,* 178 Misc 2d 427; *People v Harris,* 177 Misc 2d 160; *Morris v Woodford,* 273 F3d 826.) XXII. The court conducted a legally sufficient CPL article 730 hearing, defendant's constitutional rights were not violated, and the People proved by a preponderance of the evidence that defendant was competent to proceed to the penalty phase of trial. (*People v Goodman,* 280 AD2d 611; *People v Marcus,* 266 AD2d 566; *People v Roussopoulos,* 261 AD2d 559; *People v Davis,* 258 AD2d 528; *People v Mendez,* 306 AD2d 143; *People v Baranek,* 287 AD2d 74; *Davis v Alaska,* 415 US 308; *Douglas v Alabama,* 380 US 415; *Pointer v Texas,* 380 US 400; *People v Parker,* 57 NY2d 136.) XXIII. The trial court was correct when it denied defendant's request to discharge the jury between the guilt and penalty phases of the trial. (*Barclay v Florida,* 463 US 939; *California v Ramos,* 463 US 992; *People v Harris,* 176 Misc 2d 967, 98 NY2d 452; *Lockhart v McCree,* 476 US 162; *Matter of Bliss v Bliss,* 66 NY2d 382; *Boyde v California,* 494 US 370.) XXIV. The court properly refused to discharge seated juror 11 during presentencing-phase questioning of sworn jurors. (*People v Harris,* 176 Misc 2d 967, 98 NY2d 452; *People v Robinson,* 88 NY2d 1001; *People v Stephens,* 84 NY2d 990; *People v Kello,* 96 NY2d 740; *People v Velasquez,* 1 NY3d 44; *People v Kinchen,* 60 NY2d 772; *People v Tarsia,* 50 NY2d 1; *People v Berg,* 59 NY2d 294; *People v Cargill,* 70 NY2d 687; *People v Williams,* 63 NY2d 882.) XXV. Defendant had no constitutional right to present to the sentencing jury unqualified opinion evidence concerning his potentially positive contribution to state prison. (*Skipper v*

*South Carolina,* 476 US 1; *Jones v United States,* 463 US 354; *Matter of Oswald N.,* 87 NY2d 98; *Matter of Francis S.,* 87 NY2d 554; *People v Kenny,* 30 NY2d 154; *Dougherty v Milliken,* 163 NY 527.) XXVI. The claimed omission of "three critical factors" from the verdict sheet did not deprive defendant of a fair and reliable sentencing determination. (*Lockett v Ohio,* 438 US 586; *Buchanan v Angelone,* 522 US 269; *United States v Battle,* 979 F Supp 1442, 173 F3d 1343; *Green v Georgia,* 442 US 95; *Chambers v Mississippi,* 410 US 284; *People v Mateo,* 175 Misc 2d 192; *Martini v Hendricks,* 188 F Supp 2d 505; *Green v French,* 978 F Supp 242; *People v Crimmins,* 36 NY2d 230.) XXVII. The summations for both the guilt and penalty phases were appropriate advocacy for capital punishment and did not usurp the jury's function as the ultimate arbiter of the sentencing determination. (*People v Clemmings,* 300 AD2d 672; *Simmons v South Carolina,* 512 US 154; *People v Cahill,* 2 NY3d 14; *People v Brugman,* 199 AD2d 202; *People v Tardbania,* 72 NY2d 852; *People v Nuccie,* 57 NY2d 818; *People v Woods,* 296 AD2d 430; *People v Jenkins,* 302 AD2d 978; *People v Bruen,* 136 AD2d 648; *People v Bierenbaum,* 301 AD2d 119.) XXVIII. The trial court's sentencing instructions assured that defendant was reliably sentenced. (*People v Fields,* 87 NY2d 821; *People v Barr,* 75 AD2d 14, 50 NY2d 999; *People v Slacks,* 90 NY2d 850; *People v Coleman,* 70 NY2d 817; *Jones v United States,* 527 US 373; *Bryan v United States,* 524 US 184; *California v Brown,* 479 US 538; *United States v Park,* 421 US 658; *Cupp v Naughten,* 414 US 141; *Boyd v United States,* 271 US 104.) XXIX. The penalty phase evidence completely justified imposition of the death penalty. (*People v Benzinger,* 36 NY2d 29; *People v Gaimari,* 176 NY 84; *People v Nucci,* 162 AD2d 725; *People v Garafolo,* 44 AD2d 86; *Lowery v Anderson,* 69 F Supp 2d 1078, 225 F3d 833.) XXX. New York's death penalty does not violate either the State Constitution or Federal Constitution. (*Matter of Hynes v Tomei,* 92 NY2d 613; *People v Davis,* 43 NY2d 17; *Gregg v Georgia,* 428 US 153; *People v Smith,* 63 NY2d 41; *People v Scalza,* 76 NY2d 604; *People v Bright,* 71 NY2d 376; *People v Foley,* 94 NY2d 668; *People v Thompson,* 83 NY2d 477; *United States v Mazurie,* 419 US 544; *People v Broadie,* 37 NY2d 100.) XXXI. The trial court correctly denied defendant's challenge to New York's lethal injection procedures. (*People v Stevens,* 91 NY2d 270; *People v De Jesus,* 54 NY2d 447; *People v Hernandez,* 93 NY2d 261; *City of New York v Long Is. Airports Limousine Serv. Corp.,* 48 NY2d 469; *First Natl. Bank of Amsterdam v Shuler,* 153 NY 163; *People ex rel. Kemmler v Durston,* 119 NY 569; *In re Kemmler,* 136 US

436; *People v Kemmler,* 119 NY 580; *People v Stevens,* 91 NY2d 270; *Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo,* 64 NY2d 233.)

*Committee on Capital Punishment, Association of the Bar of the City of New York,* New York City (*Joshua L. Dratel* of counsel), for Association of the Bar of the City of New York, amicus curiae. I. The strict scrutiny standard applies to New York substantive due process claims involving the death penalty. (*Town of Orangetown v Magee,* 88 NY2d 41; *City of Amsterdam v Helsby,* 37 NY2d 19; *Mark G. v Sabol,* 93 NY2d 710; *People v Koertge,* 182 Misc 2d 183; *People v Adams,* 53 NY2d 241; *People v P. J. Video,* 68 NY2d 296; *People v Alvarez,* 70 NY2d 375; *Furman v Georgia,* 408 US 238; *People v Scott,* 79 NY2d 474; *Cooper v Morin,* 49 NY2d 69.) II. New York's death penalty statute does not pass the strict scrutiny test, and therefore it violates the Due Process Clause. (*People v Smith,* 63 NY2d 41; *People v Oliver,* 1 NY2d 152; *People v Hale,* 173 Misc 2d 140; *Matter of Westchester County Med. Ctr. [O'Connor],* 72 NY2d 517; *Furman v Georgia,* 408 US 238; *Sumner v Shuman,* 483 US 66.) III. Other states, international communities and other sources show that New York's death penalty fails the least restrictive means test and violates due process. (*Gregg v Georgia,* 428 US 153.)

### OPINION OF THE COURT

READ, J.

A jury convicted defendant Robert Yale Shulman, a confessed serial killer, of several offenses, including one count of first-degree murder for intentionally causing the death of three women in "separate criminal transactions . . . committed in a similar fashion" (Penal Law § 125.27 [1] [a] [xi]). Because the People filed a notice of intent to seek the death penalty, a separate sentencing proceeding followed (*see* CPL 400.27 [1]) in which the jury concluded unanimously that defendant should be executed. As is mandated, defendant appealed directly to this Court (*see* CPL 450.70 [1]; 470.30 [2]; *see also* NY Const, art VI, § 3 [b]).

The death sentence is no longer at issue in this case. Defendant contends, and the People do not dispute, that developments before our decision in *People v LaValle* (3 NY3d 88 [2004]) require that the sentence of death be set aside. In *Matter of Hynes v Tomei* (92 NY2d 613 [1998], *cert denied* 527 US 1015 [1999]), we struck certain plea provisions from the CPL,

concluding that they created an unconstitutional two-tiered penalty level for death penalty cases (*see id.* at 620). Citing *People v Harris* (98 NY2d 452 [2002]), where "we set aside the death sentence of a defendant who went to trial while the plea provisions were in effect" (*People v Mateo*, 2 NY3d 383, 399 [2004], *cert denied* 542 US 946 [2004] [*Mateo II*]), defendant asserts that we are likewise compelled to set aside his death sentence. We agree. Accordingly, we have no occasion to consider any of defendant's other, now academic challenges to imposition of the death penalty in this case (*see id.* at 401; *see also Harris*, 98 NY2d at 496-497).

Defendant also presses numerous grounds for reversing his convictions, to which we now turn (*see* CPL 450.70 [1]; 470.30 [2]; *see also People v LaValle*, 3 NY3d at 102-116; *Mateo II*, 2 NY3d at 401; *People v Culhane*, 33 NY2d 90, 94-95 [1973]). For the reasons that follow, we affirm defendant's convictions.

## I.

At about 8:05 A.M. on December 7, 1994, an employee of the Suffolk County Department of Public Works, while traveling on Long Island Avenue from the Department's garage in Yaphank to a job site in the Town of Medford, noticed what appeared to be a brand-new blue Rubbermaid garbage can lying on its side amidst other debris at the road's edge. Stopping his pickup truck to observe the garbage can more closely, he thought to himself that "somebody had dumped a bad load of meat." Upon arriving at the job site, he told his supervisor about this discovery, and suggested that department personnel clean up the area and retrieve the garbage can for use to store their tools. On his way back from the job site to the garage later that morning, the supervisor pulled over to inspect the garbage can. He discovered a woman's remains.

The victim's nude body was partially covered with plastic bags, and a white towel or bath mat was wrapped around her head. A white powdery substance, later determined to be baking soda, was visible on her remains. The victim's left leg was severed midway between the knee and groin area; both arms had been amputated; she had sustained serious blunt force trauma to the face, head, eye, nose and mouth. The victim's left arm displayed a tattoo consisting of a red heart and a banner with the name "Adrian." Despite extensive efforts by the police to find out who this woman was in life, to this day she remains identified only as "Jane Doe Medford."

On April 6, 1995, employees at a recycling plant in Brooklyn, which processes refuse from New York State and elsewhere, happened upon a second dismembered nude female body. The corpse was discovered on a conveyor belt, which was halted just before its contents would have been deposited into a compactor, tied into a bale and transferred to a landfill. This victim was missing her legs; her right arm was cut off at the shoulder, while the left arm, which was severed above the wrist, displayed what appeared to be a self-administered tattoo depicting two small crosses. The head and torso were stuffed in a black plastic bag; the victim's face was badly battered. She was subsequently identified as Lisa Ann Warner.

On December 11, 1995, an employee of a sheet metal company located on Old Walt Whitman Road in Melville, New York, stopped for a lottery ticket on his way into work in the morning. At about 4:00 P.M., he discovered that he had misplaced the ticket. Fearing that he might have accidentally thrown it out, the employee launched a search that ultimately led to a dumpster located in the company's parking lot. When he and a coworker began rummaging through the dumpster to find the ticket, the employee spotted what looked like a quilt and a brand-new sleeping bag, partially encased in plastic garbage bags. He nudged the sleeping bag with a piece of wood, and felt something "hard" inside it, which he assumed was a dead animal. He then enlisted the help of another coworker, who coaxed the sleeping bag's zipper open with the piece of wood. A human foot protruded.

The victim was a female; both of her hands had been cut off just above the wrist. She had suffered severe head trauma and was nude, although a blood-soaked white tee shirt was near her head as was a blue brassiere. Her left breast bore a tattoo with the name "Melani," and just below it, what appeared to be two flowers with their stems intertwined. A powdery white substance, later identified as principally calcium carbonate, was visible on her corpse. Because there was no way to fingerprint the victim, the police released a physical description and a photograph of the tattoo to the news media, and requested help from the public in identifying her.

Acting on an anonymous tip, on December 13, 1995, Suffolk County Homicide Detective Joseph White went to an address in Hollis, Queens, where he talked to three women. They identified the victim as Melani, a fellow prostitute who, like them, worked Jamaica Avenue between 198th Street and Francis

Lewis Boulevard. Detective White eventually took statements from Camille M. and Maggie D., both of whom last saw Melani on December 8, 1995. They observed Melani, later identified as Kelly Sue Bunting, getting into an older model blue Cadillac driven by a white male. On December 14, 15 and 16, Detective White canvassed a number of area motels patronized by prostitutes, reasoning that Melani could not have been killed and dismembered in a motel room without leaving behind the conspicuous signs of a bloody encounter. He found no information to assist him in his investigation.

From his conversations with several prostitutes, however, Detective White learned that a white male who drove a blue Cadillac frequently solicited them along Jamaica Avenue. This man took the women not to a motel, but to a residence in Nassau County. He lived in a room in the rear of the first floor, which was entered from the back through a screened-in porch. He would ask the women to strip and "cook" his powdered cocaine into crack, using baking soda and water. Over time, Detective White obtained consistent statements from five different women (Dawn V., Kathleen W., Roxanne L., Virginia S. and Ann H.) about this man and his habits.

On January 2, 1996 and again on January 3, 1996, first Kathleen W. and then Dawn V. escorted Detective White to a house in Hicksville, where a 1983 blue Cadillac was parked in the driveway. From the license plate number, Detective White established that the car was registered to an individual who turned out to be defendant's brother.

Detective White had discovered that only Sears sold the brand of sleeping bag in which Kelly Sue Bunting's corpse was wrapped. Once he learned the name of the individual to whom the blue Cadillac was registered, he contacted Sears's loss prevention office in Boston on January 4, 1996 to confirm that this brand of sleeping bag was indeed exclusive to Sears (it was) and to inquire whether this individual (defendant's brother) had "any history with Sears department stores as a customer." The Sears employee to whom Detective White spoke indicated that Sears had a record of defendant's brother at the Hicksville address, and that he was a post office employee and a member of a postal credit union, but did not have a Sears credit card. She then "asked [the detective] if [he] was aware there was a Robert Shulman at that address" in Hicksville. This was how defendant's name first surfaced in the Bunting investigation. Detective White learned that defendant had obtained a Sears

credit card in July 1995, although it had never been used, and that, like his brother, he was a post office employee and a member of the postal credit union.

On January 4, 1996, Detective White also initiated surveillance of the Hicksville residence, and the police took photographs of a white male who left the house and of the car in which he drove away. That same day, Kathleen W. and Dawn V., the two women who had led Detective White to the house, identified these photographs as depicting the white male who solicited prostitutes along Jamaica Avenue and the blue Cadillac that he drove. On January 6, 1996, Roxanne L. likewise identified the photographs. She further informed Detective White that this man had told her that he worked the night shift at the post office; that his brother also lived in the Hicksville residence; and that he was angry at Melani for "beat[ing] him out of" some coke that she had bought for him. On January 14, 1996, Camille M., one of the women who saw Kelly Sue Bunting on December 8, 1995, selected defendant's photograph from a photo array of 10 individuals, and the blue Cadillac registered to his brother from a photo array of eight vehicles.

On January 16, 1996, Detective White approached postal authorities for information about the work schedules of both defendant and his brother. A postal inspector advised him that defendant's brother worked as a mail handler at the 28th Street post office in Manhattan from 4:00 P.M. to 12:30 A.M., with Tuesdays and Wednesdays off; and that defendant worked as a mail handler at the post office in Hicksville from 10:30 P.M. to 7:00 A.M., with Sundays and Mondays off. Detective White subsequently learned from the postal inspector that defendant had not worked as scheduled on December 7, 1994 (specifically, he left work at 7:00 A.M. on December 6, 1994, and returned to work at 6:30 P.M. on December 7, 1994) and December 8, 1995. Jane Doe Medford's body was discovered on the morning of December 7, 1994; Kelly Sue Bunting was last seen alive on December 8, 1995.

At about 2:28 P.M. on January 20, 1996, Detective White observed the white male previously identified by Kathleen W., Dawn V. and Roxanne L. from surveillance photographs drive another white male from the Hicksville residence to the train station. At this point in the Bunting investigation, Detective White knew that the automobile was registered to defendant's brother and, based on the information from Sears, that both defendant and his brother lived at the Hicksville address. By cor-

relating the surveilled movements of these two men with the known work schedules and work locations for defendant and his brother as well as by observing whether lights were on or off in different areas of the Hicksville residence, the police were able to ascertain that the man identified by Kathleen W., Dawn V. and Roxanne L. was defendant, and that he lived in the rear of the house's first floor.

On January 25, 1996, Detective White showed the photo arrays to Maggie D., the other woman who had seen Kelly Sue Bunting on December 8, 1995. She selected defendant's photograph as depicting this individual, and the blue Cadillac registered to his brother as the car that he was driving at the time. On that same day, Detective White asked Camille M., who had selected defendant's photograph from the photo array on January 14, 1996, to look at a photo array including a photograph of defendant's brother but not defendant. She was unable to make any identification.

On January 26, 1996, Detective White met with Virginia S., who described a white male who had picked her up in the vicinity of Jamaica Avenue in a blue Cadillac about four times, and had taken her back to his place in Nassau County. She recalled having seen a work bench or table with tools, including a hacksaw and a hammer, in the screened-in porch off his room, and observed that he "always had baking soda around to cook his drugs." She also related that this man had told her that his name was "Bob," and that she had seen items in his room with the name "Bob" on them. She selected defendant's photograph and the photograph of the car registered to defendant's brother from the photo arrays.

On February 12, 1996, Ann H. recounted her single encounter with defendant to Detective White. She identified defendant and the car registered to his brother from the photo arrays. She described his room in the rear of the Hicksville residence as "filthy."

At that time, defendant was assigned to work in a small security booth at the post office in Hicksville. With the assistance of postal inspectors, on March 21, 1996, Detective White and personnel from the Suffolk County Crime Laboratory gained access to this padlocked booth just after defendant completed his shift and left for the day. Crime lab personnel photographed the booth and also vacuumed and performed tape lifts.

Defendant's brother often parked the blue Cadillac on a certain residential street in Hicksville near the train station

before taking the train into Manhattan to work. On March 22, 1996, Detective White arranged for an officer in the canine unit to check six cars (including the blue Cadillac) parked on this street with the officer's "cadaver dog," a canine certified as having successfully completed various training exercises to detect body fluids or parts or decaying flesh. The canine officer did not know in advance which car was the object of Detective White's suspicions. He walked the dog down the block past the six cars, and back up the block past five cars.[1] He informed Detective White that his dog had reacted positively to one of the cars—the blue Cadillac registered to defendant's brother.

On March 25, 1996, Detective White met with personnel from the crime lab to discuss their findings with respect to trace evidence recovered in connection with the bodies of Jane Doe Medford and Kelly Sue Bunting, and at the security booth where defendant worked. Trace evidence detected with both bodies included worn and debris-laden light blue carpet fibers, orange carpet fibers, cat hairs and foam padding. In addition, jute carpet backing was found on Kelly Sue Bunting's body and the wrappings in which she was enshrouded. These same five items—worn and debris-laden light blue carpet fibers, orange carpet fibers, cat hairs, foam padding and jute—turned up in the sweepings and tape lifts from the security booth where defendant worked. The laboratory technician told Detective White that there was a "strong associative connection" among these five items.

The Suffolk County Police arrested defendant near his Hicksville residence on April 6, 1996. Detective White placed defendant in the back seat of an unmarked police car for the trip to the police station at Yaphank, and advised him of his *Miranda* rights, which he waived. On the way, Detective White showed defendant a photograph of Kelly Sue Bunting. Defendant made several incriminating statements while simultaneously denying responsibility for her death.

Detective White and other detectives interviewed defendant at the police station. When the detectives asked him to talk about prostitutes, he replied that they hate and kill people. When they pointed out that he killed people, too, he responded that he was paying the officers' salaries, that he was a good citizen who paid taxes while the girls committed crimes and did not pay taxes, yet no one locked them up. He subsequently gave

---

1. Someone had entered and driven one of the cars away in the meantime.

four written statements in which he described the circumstances of the killings of Kelly Sue Bunting, Jane Doe Medford and Lisa Ann Warner; he agreed to give hair, blood and saliva samples.

Defendant claimed that after having smoked crack with Melani, he blacked out and later awakened to find her lying face down on the floor with blood everywhere, including by her head and on both his hands; that he had used tools stored on the screened-in porch to saw off her hands "so no one could identify her"; that he wrapped her body in plastic garbage bags and two sleeping bags and put the body in the trunk of his brother's car, along with her clothes and a small brown paper bag in which he had placed her severed hands; that he discarded the paper bag in a garbage can at a fast-food restaurant and the clothes in a dumpster at another location; that he threw the body away in a dumpster at a factory near the Mid-Island post office where he once worked; that there was a lot of blood to clean up in his room, causing him to dispose of a blood-stained greenish blue carpet; and that he wished that he had cut out Melani's tattoo once he read in the newspaper that she had been identified by it. In his own handwriting, defendant also inscribed three photographs from the Bunting investigation (two of the dumpster where Kelly Sue Bunting's remains were discovered; one of her body at the morgue) with statements admitting to his dismemberment and disposal of the body, and signed his name.

Defendant admitted that he had killed Jane Doe Medford in his room, and again claimed that he had blacked out after smoking crack with her, only to awaken and find her unaccountably dead and bleeding from the face and head. So that she would not be identified, he used an axe and a hacksaw to dismember her body; he threw the axe and hacksaw away in the trash afterwards; he disposed of her body parts "all over the place," and similarly discarded her belongings in various dumpsters. Because he could not dispose of her remains immediately, he sprayed her remains with an air freshener and sprinkled them with baking soda to mask the odor of decomposition.

Defendant acknowledged, inscribed and signed photographs related to the killing of Lisa Ann Warner. He admitted that he killed all the victims in his room at the Hicksville residence. According to defendant, he picked up Lisa Ann Warner along Jamaica Avenue; returned to his room and smoked crack with her; blacked out and awakened to find her dead from head wounds (but he also admitted to hitting her with a hammer); dismembered her body and disposed of her body parts and clothes in different locations.

When one of the detectives suggested to defendant that he should "[g]et away from the lie about blacking out, [which was] just not believable," he agreed, stating that he had not blacked out but instead had "just lost control" and sometimes felt anger and rage. He recounted that he had killed Jane Doe Medford with a baseball bat; Kelly Sue Bunting with a dumbbell; and Lisa Ann Warner with a hammer. Defendant threw out these makeshift weapons immediately afterwards because he would always think that "it's not going to happen again." He reiterated that he cut off his victims' limbs in his room and discarded their body parts in multiple locations in order to foil identification.

Based upon information from these postarrest confessions, on April 7 and April 8, 1996 the police executed a search warrant for defendant's room, which was photographed, partially disassembled and transported to various divisions of the crime lab. There they discovered evidence of drug use, baking soda, calcium carbonate, air fresheners, carpet cleaners, and hundreds of apparent bloodstains on the walls, ceilings and surfaces of practically every freestanding item. Through DNA analyses, various stains were determined to be consistent with the DNA profiles of Jane Doe Medford, Lisa Ann Warner or Kelly Sue Bunting.

## II.

Defendant contends, among other things, that the police lacked probable cause to arrest him; and that the trial court erred by rejecting his for cause challenges to certain prospective jurors, and abused its discretion by denying his request to question the seated jurors as to whether they had read a particular newspaper headline. Defendant also maintains that the trial court improperly instructed the jury as to the meaning of first-degree "similar fashion" murder.

### A. Probable Cause

Defendant claims that the evidence offered by the People at the suppression hearing fell short of demonstrating prima facie that it was more probable than not that he committed the offenses being investigated. Probable cause "does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been . . . committed" by the person arrested (*People v Bigelow*, 66 NY2d 417, 423 [1985]). When

determining whether the police had probable cause to arrest, the "inquiry is not as to defendant's guilt but as to the sufficiency for arrest purposes of the grounds for the arresting officer's belief that [the defendant] was guilty" (*People v Coffey*, 12 NY2d 443, 452 [1963]; *see* CPL 140.10 [1] [b]). Further, while defendant invites us to look at each fact or circumstance considered by the police as though standing alone, "[t]he legal conclusion [as to whether probable cause existed] is to be made after considering *all* of the facts and circumstances together" (*Bigelow*, 66 NY2d at 423 [emphasis added]). A synoptic evaluation is essential because "[v]iewed singly, these may not be persuasive, yet when viewed together the puzzle may fit and probable cause found" (*id.*).

Detective White testified at the suppression hearing about what the police had discovered over the course of a painstaking four-month investigation: that Kelly Sue Bunting was last seen alive in defendant's company; that Kelly Sue Bunting and Jane Doe Medford were both killed by being severely beaten about the face and head and were disposed of as trash, minus hands or limbs, suggesting a common killer; that the trace evidence associated with the bodies of Kelly Sue Bunting and Jane Doe Medford (worn and debris-laden light blue carpet fibers, orange carpet fibers, cat hairs, jute and foam padding) was also present in the security booth where defendant worked; that defendant did not work as scheduled on December 7, 1994, the day Jane Doe Medford's body was discovered, or December 8, 1995, the day Kelly Sue Bunting was last seen alive; that defendant was known to entertain prostitutes, including Kelly Sue Bunting, in his room, a relatively secluded spot entered through a screened-in porch where another prostitute had seen a work bench or table with tools, including a hacksaw and a hammer; and that several prostitutes reported that defendant always had baking soda on hand in his room, and that the bodies of Kelly Sue Bunting and Jane Doe Medford were sprinkled with a white powdery substance.[2] These multiple points of correspondence between defendant and the killings of Kelly Sue Bunting and Jane Doe Medford were evidence that it was more probable than not that defendant was the perpetrator. Accordingly, the police had a sufficient basis to arrest defendant.

---

**2.** Defendant contends that a *Frye* hearing was required to show the reliability of the dog-scent evidence presented at the suppression hearing. Because there were sufficient facts and circumstances to establish probable cause without this evidence, we need not address defendant's argument.

## B. Jury Selection

We focus upon four of defendant's jury selection claims. In three of these four claims, defendant argues that the trial court erred by rejecting his for cause challenges under CPL 270.20 (1) (b) to prospective jurors who, he asserts, possessed "a state of mind that [was] likely to preclude [them] from rendering an impartial verdict based upon the evidence adduced at the trial"; in the remaining claim, defendant contests the trial court's rejection of his for cause challenge under CPL 270.20 (1) (c). Noting that he exhausted his peremptory challenges, defendant argues that he is entitled to a new trial if the trial court committed any errors (*see* CPL 270.20 [2]). We find no error.

### 1. Prospective Juror S.C.

S.C. worked as a corrections officer on Rikers Island. In response to a question on the written juror questionnaire asking what life without parole meant to him, he wrote "3 hots and a cot, free medical, $50[,]000 a year wasted." When asked about this answer during voir dire, S.C. said that he "was just being sarcastic," and that "3 hots and a cot" was "[a] saying" he had picked up at Rikers Island, which made him "feel pretty foolish now that [defense counsel] read it back to [him]." He repeatedly assured the trial court and the parties that he could be fair and impartial.

Defendant assigns error to the trial court's rejection of his for cause challenge to S.C., arguing that S.C.'s representations of fairness and impartiality "lacked candor," and that his "cavalier manner" rendered him unfit to serve. By denying defendant's challenge, however, the trial court found S.C. to be truthful. As we observed long ago, "it was for the [trial] court to say, from the whole examination of the juror, including his appearance and demeanor, whether he was fit and competent to perform fairly and impartially" (*People v Carolin*, 115 NY 658, 659 [1889]; *see also People v Johnson*, 94 NY2d 600, 613 [2000] [determination of whether prospective juror is qualified is "committed largely to judgment of the Trial Judge with his peculiar opportunities to make a fair evaluation" (internal quotation marks omitted)]). Here, the trial court took "into consideration all of the answers that [the juror] provided to the Court and his willingness to put aside whatever his personal opinions might be and take the law as the Court gave it to him," and denied the challenge. The trial court acted within its discretion in making this determination.

2. Prospective Juror S.R.

According to defendant, S.R. voiced doubt about whether she could put a preexisting opinion regarding defendant's guilt, premised on media accounts, out of her mind. To support his claim, defendant points to isolated passages of voir dire where S.R. responded to his questions probing her ability to put her opinion aside by stating that "I think I can" or that she would "try."

Those responses, standing alone, did not render S.R. unfit to serve. As we have noted, words like "think" or "try" are "not . . . talismanic word[s] that automatically make[ ] a statement equivocal" (*People v Chambers*, 97 NY2d 417, 419 [2002]). S.R.'s other answers dispelled any doubt about her ability to deliberate impartially (*see People v Johnson*, 94 NY2d at 615 ["in considering whether a challenge for cause should have been granted, we must look not to characterizations or snippets of the voir dire but to the full record of what the challenged jurors—sworn to speak truthfully—actually said"]).

The court concluded the voir dire by asking S.R. if she would want a juror with her "state of mind" to sit on a case in which either she or a loved one was on trial (*compare People v Chambers*, 97 NY2d at 419 [noting that "an additional question or two at voir dire would easily dispel any doubt as to equivocation, assure an impartial jury, and avoid the delay, and risk, of appeals"]). S.R. unhesitatingly answered "Absolutely." In light of that response as well as her many other assurances of impartiality, the trial court had ample basis for rejecting defendant's for cause challenge to S.R. (*compare People v Torpey*, 63 NY2d 361, 367 [1984] [trial court erred by denying the defendant's for cause challenge to a prospective juror who stated, among other things, "that it would 'probably not' be fair to the defendant to have somebody with her state of mind on the jury"]).

3. Prospective Juror T.V.

Defendant claims that the trial court should have granted his for cause challenge to T.V., which was based on this prospective juror's acknowledgment during voir dire that he had read a newspaper article about jury selection in the case. When prospective jurors filled out written questionnaires two months before voir dire, the trial court instructed them not to read media accounts of the case. Defendant now argues that T.V.'s supposed disregard of this instruction showed that he would not

have been able to comply with future instructions, thereby rendering him unfit for service.

■ T.V. did nothing warranting exclusion under CPL 270.20 (1) (b). T.V.'s forthright acknowledgment that he had read the article displayed not a wanton disregard of a court order, but rather an honest misunderstanding of what the trial court had instructed. The record shows that T.V. incorrectly believed that only articles detailing the underlying facts of the crimes charged were off limits. Nor does the rest of the voir dire show that the juror was unwilling to follow the trial court's instructions. T.V. gave every indication that he could be impartial. When instructed further on the scope of the trial court's direction not to read media accounts of the case, T.V. stated that he would comply.

4. Prospective Juror J.C.

Defendant claims that J.C. should have been excluded under CPL 270.20 (1) (c), which provides a for cause challenge when a prospective juror "is related within the sixth degree by consanguinity or affinity to" certain enumerated persons, including "counsel for the people." We disagree.

■ Prior to the commencement of trial, J.C.'s brother-in-law (the brother of J.C.'s wife) had been employed as a prosecutor by the Suffolk County District Attorney's Office. While there, he had worked in the Homicide Bureau and had attended a single meeting regarding the investigation of defendant, which occurred prior to defendant's arrest. At no point did the brother-in-law make any court appearances in defendant's case. In fact, the brother-in-law resigned from the office and moved to Nevada shortly after defendant's arrest and months before the start of jury selection. We decline to define "counsel for the people" as encompassing the tangential relationship presented here.

## C. Midtrial Publicity

The trial court repeatedly cautioned the seated jurors that, while they were permitted to read newspapers during the trial, if they saw a headline mentioning the case they were not to read the associated article. The trial court also committed to save all trial-related articles as court exhibits so that the jurors might read them once the trial was over if they so chose.

At the beginning of a Monday court session, the trial court thus created as a court exhibit an article about the trial appear-

ing in Newsday the previous weekend. The headline on the article read "Link to 2 More Victims." The article appeared following the Friday testimony of the People's forensic serologist, in which blood matches to Kelly Sue Bunting, Jane Doe Medford and Lisa Ann Warner were discussed. Thus, a reader seeing only the headline might have thought that it referred to testimony that the jury had heard. Anyone reading the article, however, would have learned otherwise. The article discussed facts that were not before the jury, reporting that defendant faced charges in Westchester County for two murders in addition to the three of which the jury was aware, and that blood evidence found in his room matched that of two missing women, one of whom was last seen with defendant in Manhattan.

After some housekeeping measures were taken care of, defense counsel asked to be heard with regard to this court exhibit. Stating that he was "not sure exactly what the headline said," counsel asked the trial court to read it aloud. After being handed the exhibit, the trial court stated that "[t]he headline reads, Link to Two More Victims."

Upon hearing the headline, defense counsel made the following application:

> "Your Honor, I would ask the Court to inquire of the jurors and make sure that none of them have read the headline inadvertently or [that] anyone discussed with them what appeared in the newspaper with respect to the [Newsday] article . . . .

> "I think it was very, very prejudicial and potentially very damaging to [defendant] if the jurors by some way indirectly or directly found out about *the information that's contained not in the article but just the headline*, which is an extremely provocative *headline*, and I would ask the Court to make some inquiry of the jury with regard to this exhibit" (emphasis added).

In response, the prosecutor expressed a misgiving that, by querying the jurors about the headline, "all it really is doing is calling attention to the article." As the prosecutor put it:

> "there's been articles written about the case since the hearings began and not with respect to any particular article would we specifically ask the jurors if they read a particular article and read a particular

headline, and I just think all it does is really highlight the article and . . . peak [sic] their curiosity."

After this exchange, the trial court noted that the "subheadline on the article reads, Prosecutor[:] Blood in Shulman's Home Matches Women"; and that "[a]lthough I suppose that someone can read it and speculate that there [were] some additional victims, it, nevertheless, is somewhat neutral." As previously noted, the article appeared during the examination of the People's forensic serologist, who had given testimony regarding blood matches to the three victims. The trial court therefore declared that:

"I am inclined to go along with the prosecutor's view, that if I were to inquire of the jurors about this, that I would simply be highlighting it for them and might, in fact, invite them to inquire from other people who may have read the paper or even to go back and look at the paper themselves, so I'm inclined to deny defendant's request at this time."

Defendant now argues that the trial court erred by not asking the jurors if they had read the headline or heard about the article's contents from other people.[3] In particular, defendant contends that the trial court was required to survey the jurors on these points, following a three-part test devised by United States Court of Appeals for the Second Circuit for a federal trial court to apply when faced with jurors' exposure to potentially prejudicial midtrial publicity.

The Second Circuit most recently discussed this three-part test in *United States v McDonough* (56 F3d 381 [2d Cir 1995]). As articulated by the court, the inquiry is:

" 'first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors—outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly' " (*id.* at 386, quoting *United States v Gaggi*,

---

**3.** Defendant's application at trial focused solely on the headline. Moreover, defendant has never expressed any concern that the jurors, in disobedience of the trial court's instructions, might have read the article.

811 F2d 47, 51 [2d Cir 1987], *cert denied* 482 US 929 [1987]).

In *McDonough*, an article highly critical of the defendant and skeptical about his prospects on the witness stand appeared in a local newspaper the day before he was scheduled to testify. Describing the article as "poisonous" (56 F3d at 385), the District Court embarked upon the three-part test at the defendant's behest. The defendant disputed whether the court had taken sufficient measures to ascertain whether exposed jurors remained able to decide the case fairly, as required by the third prong of the three-part test. Reviewing the lower court's decision for abuse of discretion and affording it deference, the Second Circuit concluded that the District Court had acted reasonably in evaluating juror impartiality, and affirmed the conviction.

We need not consider whether we would adopt the three-part test of *McDonough* in a similar case because this case is different. The trial court correctly described the ambiguous headline as "somewhat neutral"; it certainly was not "poisonous." We have afforded trial courts wide flexibility in determining what, if any, steps are required to assure a defendant's right to a fair trial in light of the particular midtrial publicity and circumstances encountered, subject to appellate review for an abuse of discretion (*see People v Moore*, 42 NY2d 421, 433-434 [1977], *cert denied* 434 US 987 [1977] [trial court did not abuse its discretion by refusing to take corrective measures requested by defendant to guard against potential prejudice from media reports appearing during jury selection]). Of course, in every case "the facts must be examined to determine the nature of the material placed before the jury and the likelihood that prejudice would be engendered" (*People v Brown*, 48 NY2d 388, 394 [1979]).

Here, the trial prosecutor identified a very significant consideration militating against the midtrial voir dire requested by defendant, which the trial court found to be persuasive; namely, that inquiring about the headline would inevitably focus the jurors' attention on something that there was no indication any of them had seen, and might well foster infelicitous speculation. This was especially so because the trial court had not asked the jurors about any of the many past headlines or news accounts relating to the trial. In short, we conclude that the trial judge did not abuse his discretion when he declined to survey the jury as requested by defendant.

## D. First-Degree "Similar Fashion" Murder

Penal Law § 125.27 (1) (a) (xi) provides that

> "[a] person is guilty of murder in the first degree when . . .

> "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and . . .

> "the defendant intentionally caused the death of two or more additional persons within the state in separate criminal transactions within a period of twenty-four months when committed in a similar fashion or pursuant to a common scheme or plan."

Defendant argues that the trial court erred by rejecting his request to instruct the jurors to disregard his postmortem conduct (specifically, the mode of dismembering and discarding of his victims' bodies) when determining whether he committed first-degree "similar fashion" murder.[4]

The gist of defendant's claim is that "similar fashion" relates solely to the killing acts underlying the first-degree murder charge, not to the entirety of each "separate transaction." As defendant put it at trial, the element of "similar fashion" can be established only by reference to the "nature and type of injuries" inflicted and the "instrumentality that was used or not used" when committing the crime. He asserts that plain language compels this construction of the statute, as does the Legislature's avowed goal of creating a death-eligible crime sufficiently narrow to pass constitutional muster. We disagree.

---

4. As for the actual charge, the trial court informed the jurors that, to convict for first-degree murder, they had to find eight elements, including that the three murders were committed in a similar fashion. As to that discrete determination, the trial court instructed the jurors that:

> "[b]y way of guidance, I offer you the following legal definitions to aid you in your determination on this element.

> "When a series of crimes are committed in a similar fashion, they have a similar modus operandi.

> "Modus operandi refers to the method used in the commission of the crime.

> "When crimes have a similar modus operandi, their method of commission is said to follow a repetitive pattern. A pattern is a reliable sample of traits, acts or other observable features.

> "Similar means merely corresponding. Resembling in many respects, somewhat like, having a general likeness, although allowing for some degree of difference."

Defendant's proposed construction—to have "caused the death of two or more additional persons . . . when committed in a similar fashion"—is linguistically awkward. "[C]ommitted in a similar fashion" more naturally relates back to "separate criminal transactions," the immediately preceding phrase. "Relative or qualifying words of clauses . . . ordinarily are to be applied to the words or phrases immediately preceding, and are not to be construed as extending to others more remote, unless the intent of the statute clearly indicates otherwise" (McKinney's Cons Laws of NY, Book 1, Statutes § 254). Legislative history further supports this reading of the statute. The Assembly Codes Committee Bill Memorandum explains that subparagraph (xi) of Penal Law § 125.27 (1) (a), the death penalty statute's serial murder provision, "makes an intentional killing first degree murder when the defendant has committed two or more additional intentional killings within a 24 month period *in separate criminal transactions that were committed in a similar fashion* or pursuant to a common scheme or plan" (Mem of Assembly Codes Comm, Bill Jacket, L 1995, ch 1 [emphasis added]).

From a commonsense perspective, there is no reason to hold that similarity must be shown by the killing act alone. Indeed, in *People v Mateo* (93 NY2d 327, 333 [1999] [*Mateo I*]),[5] we declined to adopt a comprehensive definition of similarity, because "[t]o do so . . . would ignore the relative nature and contextual considerations inherent in any analysis and application of the 'similarity' element" (*id.*). Thus, we anticipated that "similar fashion" could, depending upon the circumstances of an individual case, encompass more than just the actual killing acts.

Further, we specifically pointed out that, although Mateo shot all his victims, his various killings were not undertaken in a "similar fashion" because:

> "the murder victims were of different ethnic and racial backgrounds and ranged in age from 16 to 20. A .45 caliber handgun, a .38 caliber handgun, a .25 caliber handgun, and a sawed-off shotgun were the varied weapons used to commit these murders. The motives for each shooting differed, as did the

---

**5.** We handed down our opinion in *Mateo I* after defendant's conviction; however, the parties and trial court considered the lower court opinions, which we subsequently affirmed, although with somewhat different reasoning.

wounds inflicted by defendant upon his victims. Moreover, the locations of these multiple killings were different" (id.).

The factors that we enumerated go well beyond the "nature and type of injuries" inflicted and the "instrumentality that was used or not used" when committing the crime, which defendant asserts should delimit similarity. Postmortem conduct may well be relevant.[6] What counts is the similarity of the conduct, not whether it occurred before or after the victim's death.

■ In all three murders underlying this case, defendant brought the women to the room where he lived and killed them by repeatedly beating them about the face and head with a heavy, blunt object, variously, a baseball bat (Jane Doe Medford), a dumbbell (Kelly Sue Bunting) and a hammer (Lisa Ann Warner). Defendant used such force that he split the victims' skulls open. Afterward, defendant hacked off the victims' hands or limbs and disposed of the bodies in garbage receptacles. To inhibit identification of his victims, one of whom remained unidentified at trial, defendant threw away their severed hands or limbs, again as trash, in locations away from the spots where he disposed of their bodies. There was, in short, sufficient evidence for the jury to convict defendant of first-degree "similar fashion" murder.

We have considered defendant's remaining challenges to his conviction, and conclude that they also lack merit. Accordingly, the judgment of County Court should be modified by vacating the sentence of death imposed upon conviction of murder in the first degree, and remitting to County Court for resentencing in accordance with CPL 470.30 (5) (c) and Penal Law §§ 60.06 and 70.00 (5) and, as so modified, affirmed.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO and R.S. SMITH concur.

Judgment modified, etc.

---

6. An extensive literature addresses the phenomenon of serial murder (see e.g. Steven A. Egger, Serial Murder: An Elusive Phenomenon [Praeger 1990]; Donald J. Sears, To Kill Again: The Motivation and Development of Serial Murder [Scholarly Resources Inc. 1991]; Ronald M. Holmes and Stephen T. Holmes, Serial Murder [Sage Publications, Inc., 2d ed 1998]). Although the cases discussed in these books disclose great variety in homicidal behavior patterns, including methods of murder, postmortem mutilation of victims often earmarks the serial killer.