THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAYHEAME HILL, Appellant. [60 NYS3d 23]—

Judgment, Supreme Court, Bronx County (Albert Lorenzo, J.), rendered March 13, 2014, convicting defendant, after a jury trial, of criminal possession of a weapon in the second degree, and sentencing him, as a second violent felony offender, to a term of 10 years, affirmed.

According to the investigating detective at a suppression hearing, the complainant reported that, while he was in an elevator, he was robbed by a man brandishing a revolver. The complainant described his assailant as a black man in his twenties, just over six feet tall and wearing a mask. The robber forced the complainant to hand over two rings, a necklace, his driver's license, and $60 in cash. After he handed over the property, the complainant heard a gunshot in the elevator fired in a downward direction. The robber told the complainant to face the wall, and then fled. Officers responding to the scene found no evidence that a bullet had been fired. This led the detective to believe that the assailant had possibly shot himself in the foot.

Later that day, the detective heard over his police radio that a man complaining of a bullet wound to his leg had arrived at a local hospital. The detective went to the hospital with the complainant and found defendant, the person the radio transmission had been referring to, in the emergency room. Defendant told the detective that he was shot while walking in the street. Without first obtaining defendant's permission, the detective took possession of two paper bags located under defendant's hospital bed, and opened them. The bags contained defendant's clothing. While the clothes were being removed, a ring fell out of the pocket in a pair of pants. The complainant identified the ring as one of the pieces of jewelry that had been taken from him during the robbery. The detective also removed a driver's license from the same pocket; it too was the complainant's.

The detective then interviewed defendant's girlfriend, who told him that she had gone with defendant to the hospital in a car. Defendant's girlfriend gave the detective the keys to the car, which he later discovered belonged to defendant's aunt. After leaving the hospital, the detective secured the vehicle at the precinct, where it was inventoried.

The detective proceeded to defendant's residence, a basement apartment. He arrived at around 1:30 a.m. with three other officers. The officers wore suits and ties and displayed their badges; though they were armed, no guns were drawn. Two sets of locked gates separated the apartment from street level. The detective banged on the gates until he was allowed inside. At the apartment, the police were met by defendant's uncle, who let the police inside. The uncle told the police that he, his wife, and their children lived in the apartment, and that defendant also stayed with them. He told the police that defendant had been at the apartment earlier that evening suffering from a bullet wound.

The detective asked the uncle for consent to search the apartment, which the uncle gave by signing a consent form that had been read to him and which gave the police permission to search "[t]he premises, [and] access . . . the apartment and accessible areas." The police recovered a Taser and a BB gun from a pile of defendant's clothes in defendant's living space, which was in the living room. After those items were recovered, in the area between the second locked gate leading to the apartment and the apartment itself, the police recovered a revolver from inside an unsecured pipe. While in the apartment, the detective also received written consent from defendant's aunt to search the vehicle in which defendant had arrived with his girlfriend at the hospital. Thereafter, back at the precinct, the detective searched the vehicle. Inside its center console, he recovered another ring that the complainant identified as belonging to him.

Defendant's uncle also testified at the suppression hearing. Although his testimony was consistent with the detective's in broad terms, he stated that he consented to the police entering the apartment only after they forced their way in, and did not know what he was signing when he signed the consent form, but just wanted to get the police out of the apartment as quickly as possible because he was afraid. Further, he stated that the police had already begun to search inside the apartment at the time he signed the consent. The uncle also testified that he never consented to the police search of the area where the revolver was recovered.

The court granted defendant's motion to suppress only to the extent of suppressing the evidence found in the clothing bags seized at the hospital. This was on the basis that the police did not have probable cause at that time to arrest defendant, who had a privacy interest in the bags. The court denied, however, suppression of the ring recovered from the vehicle, finding that defendant did not have standing to challenge the search, because he did not own, drive or borrow the vehicle, and because possession of the keys, alone, did not establish standing. In any event, the court observed, the aunt consented to the search. The court denied suppression of the gun found in the alleyway because defendant did not have standing to challenge the search of the apartment. It found that the only area of the apartment where he had an expectation of privacy was the living room where he slept, which excluded the area where the gun was found. In any event, the search was legal because the uncle consented to it.

At trial, the court submitted four counts to the jury, two each

of first-degree robbery and second-degree criminal possession of a weapon. The jury returned a verdict convicting defendant only of second-degree criminal possession of a weapon.

Preliminarily, we find that the People did not waive their argument that defendant lacked standing to challenge the searches. "[T]he People must timely object to a defendant's failure to prove standing in order to preserve that issue for appellate review" (*People v Hunter*, 17 NY3d 725, 726 [2011]; *see People v Stith*, 69 NY2d 313, 320 [1987]). Here, the People specifically argued at the suppression hearing that defendant did not establish standing to challenge the searches of the vehicle or apartment, and the court itself raised the issue of standing during counsel's argument and based its ruling on that doctrine. We reject defendant's argument that the People were required to raise the issue of standing before the close of evidence.

To have standing to challenge a search, a defendant must have a legitimate expectation of privacy in the area where the evidence was seized (*see People v Ramirez-Portoreal*, 88 NY2d 99, 109 [1996]). Defendant has the burden of establishing standing, and is entitled to rely on evidence elicited during the People's direct case (*see People v Burton*, 6 NY3d 584, 587-588 [2006]; *People v Gonzalez*, 68 NY2d 950, 951 [1986]). "The number of times a person stays in a particular place, the length and nature of the stay, [and] indicia of connectedness and privacy, like change of clothes or sharing expenses or household burdens, are all factors . . . [to] support a reasonable expectation of privacy" (*People v Rodriguez*, 69 NY2d 159, 163 [1987]). Here, defendant's uncle told the police that defendant had stayed with his family "on and off" since he was five years old. He testified that, although defendant did not have his own room in the apartment and slept on the couch, he stored all of his clothes in the living room, and received mail at the apartment. This evidence suggests that defendant had a legitimate privacy interest in the apartment and surrounding curtilage, and we find that the court erred in finding that defendant lacked standing to challenge the propriety of the search of the apartment.

On the other hand, there is no dispute that defendant did not own the vehicle, and no evidence at the hearing showed that he or his girlfriend drove the vehicle to the hospital with the aunt's permission. That the keys to the vehicle were in defendant's girlfriend's possession is insufficient to confer standing on defendant (*see People v Jose*, 252 AD2d 401, 403 [1st Dept 1998], *affd* 94 NY2d 844 [1999]). Defendant's aunt did

not testify, so we do not know whether she gave her nephew permission; further, although defendant's uncle testified that he told defendant to go to the hospital to have his leg treated, he did not state that he told him to borrow the car to get there. Under the circumstances, it cannot be said that defendant had a reasonable expectation of privacy in the car, and, accordingly, the court was correct in denying defendant's challenge to its search.

Although we find that defendant had standing to challenge the apartment search, we reject that challenge on the merits. The People bear the "heavy burden of proving the voluntariness" of a consent to search (*People v Gonzalez*, 39 NY2d 122, 128 [1976]), since such consent "must be a free and unconstrained choice[,] [and] [o]fficial coercion, even if deviously subtle, nullifies apparent consent" (*id.* at 124). Whether a defendant's consent to search was voluntary is determined based on the totality of the circumstances—with no one factor being determinative (*id.* at 128). Factors for the court to consider include (1) whether consent was given while the individual was in police custody, how many officers were present on the scene, and whether the individual was handcuffed; (2) the personal background of the individual, including his or her age and prior experience with the law; (3) whether the individual offered resistance or was cooperative; and (4) whether the police advised the individual of his or her right to refuse consent (*id.* at 128-130; *Matter of Daijah D.*, 86 AD3d 521, 521-522 [1st Dept 2011]). The suppression court's credibility determinations are entitled to great deference on the question of voluntariness, unless they were manifestly erroneous or plainly unjustified by the evidence (*People v Vasquez*, 166 AD2d 194, 195 [1st Dept 1990], *lv denied* 77 NY2d 845 [1991]; *see generally People v Prochilo*, 41 NY2d 759, 761-762 [1977]).

The People met their burden of showing that the uncle's consent was voluntary. First, at no time was he ever placed in police custody or restrained in any way. The detective testified that none of the police officers had their weapons drawn when they approached the apartment. The uncle immediately agreed to let the police into the apartment. Most importantly, it is uncontested that he signed a written form permitting the search. Defendant can point to no evidence that the uncle hesitated or initially refused to sign the consent form, and the detective denied threatening or coercing the uncle into signing. We reject defendant's argument that the consent was obtained retroactively, since the detective testified otherwise and we perceive no reason to question the court's decision to credit that testimony over the uncle's.

Finally, defendant contends that the illegality of the police's search of the clothing bags at the hospital impermissibly tainted the subsequent searches of the vehicle and apartment. He argues that the police would not have been able to search the vehicle or apartment absent the illegal search of the clothing bags, which confirmed defendant's involvement in the robbery. We reject this argument under the independent source rule.

"[W]here the evidence sought to be suppressed is the product of an independent source entirely free and distinct from proscribed police activity, it should be admissible and not subject to a per se rule of exclusion based solely on the unlawful conduct" (*People v Arnau*, 58 NY2d 27, 35 [1982], *cert denied* 468 US 1217 [1984]). "[T]he independent source rule is applicable [where] there is no causal connection, direct or indirect, proximate or attenuated, between the illegality and the subsequent seizure. In cases where this causal nexus is lacking, the exclusionary rule simply does not apply" (*id.* at 34). A key consideration in determining whether this rule applies is whether "the prosecution has somehow exploited or benefited from its illegal conduct, [whether] there is a connection between the violation of a constitutional right and the derivative evidence" (*People v Burr*, 70 NY2d 354, 362 [1987], *cert denied* 485 US 989 [1988]).

Here, the challenged searches were attenuated from the illegal search of defendant's clothing bags. When the detective entered the hospital room, his theory of the crime was that it had been committed by a black male who had a gunshot wound to the leg. Defendant fit that description. Thus, we disagree with the dissent's statement that, even if the search of the clothing bags turned up no evidence, the police "would have had little cause to pursue the investigation, let alone . . . search defendant's vehicle and home." To the contrary, regardless of what the detective were to find in defendant's possession, he was likely to continue investigating defendant as a possible suspect. Such investigation would have included the routine and natural investigatory step of interviewing defendant and his girlfriend, which is what led him to learn about the car and the apartment. Further, none of the items recovered during the illegal search was used to procure defendant's uncle's consent to search the apartment, so the police did not engage in "exploitation of [the] illegality" as charged by the defense. Concur—Tom, J.P., Mazzarelli, Andrias and Webber, JJ.

Manzanet-Daniels, J., dissents in a memorandum as follows:

The primary illegality of the police conduct in searching defendant's belongings while he was hospitalized at Jacobi Hospital is undisputed. The physical evidence subsequently discovered by the police—a ring in defendant's vehicle and a gun in the curtilage of his home—was obtained as the result of the earlier, impermissible search of defendant's belongings. I would accordingly grant the motion to suppress the physical evidence subsequently recovered as the fruit of the poisonous tree.\*

As an initial matter, defendant's argument was preserved. Defense counsel argued that because the seizure of defendant's belongings was illegal, the property of the complaining witness subsequently recovered was the product of not only the illegal arrest but of the illegal seizure.

The complainant testified that he was riding in the elevator when a masked man, described as a male black in his twenties, confronted him and took his money and jewelry. The victim heard a gunshot, but was not injured during the encounter.

After speaking with the complainant, the investigating detective heard a radio report of a man at Jacobi Hospital with a bullet wound to the leg. No description of the man was given over the radio. After interviewing defendant, the detective searched the bags under his bed, without obtaining permission to do so. The complainant identified the ID and the ring recovered from the bags as his property. It was only after showing the illegally-seized evidence to the complainant that the detective questioned defendant's girlfriend and obtained the keys to defendant's home and vehicle. This evidence, seized moments after the unlawful search and without any attenuating events, was the direct result of and not sufficiently attenuated from the illegality itself (*see People v McCree*, 113 AD3d 557, 558 [1st Dept 2014]).

There was no exigency. Defendant was confined to a hospital bed and unable to leave let alone access the areas the police searched. If the police intended to continue their investigation regardless of what was found among his personal belongings at the hospital, they could have applied for a warrant to search his vehicle and his home.

This is not a case where the exclusionary rule has no application because the connection between the illegal conduct of the police and the discovery of the challenged evidence has

---

\* Because I would suppress the challenged evidence on this ground, I do not address the alternate arguments raised by defendant and addressed by the majority.

"become so attenuated as to dissipate the taint" or the People learned of the evidence from an independent source (*Wong Sun v United States*, 371 US 471, 487 [1963] [internal quotation marks omitted]). I disagree with the majority that regardless of what the police found in defendant's possession, they were likely to pursue defendant as a possible suspect. If the police discovered nothing in the illegal search of defendant's belongings, they would have had little cause to pursue the investigation, let alone to question defendant's girlfriend, from whom they obtained the keys to defendant's vehicle, and to thereafter search defendant's vehicle and home. The necessary links between defendant and the robbery were the illegally seized identification and ring, the second ring found in the vehicle, and the gun found in the curtilage of defendant's home. The police were led to the challenged evidence by "exploitation of that illegality" (*Wong Sun*, 371 US at 488). The physical evidence recovered should have been suppressed as the fruit of the illegal search.

Admitting the ring and gun into evidence cannot be said to be harmless error under the circumstances (*see People v Crimmins*, 36 NY2d 230, 237 [1975]). The People's case depended on circumstantial evidence that the illegally-obtained ring found in the vehicle had been taken from the victim during the alleged robbery and served as the only identification of defendant during the trial.