People v Harris (2022 NY Slip Op 01484)





People v Harris


2022 NY Slip Op 01484


Decided on March 10, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:March 10, 2022

111708
[*1]The People of the State of New York, Respondent,
v
Tamale Harris, Also Known as MAX and BAGS, Appellant.

Calendar Date:January 6, 2022

Before:Garry, P.J., Clark, Aarons and Colangelo, JJ.

Paul J. Connolly, Delmar, for appellant.
P. David Soares, District Attorney, Albany (Christopher D. Horn of counsel), for respondent.



Clark, J.
Appeal from a judgment of the Supreme Court (McDonough, J.), rendered April 26, 2019 in Albany County, upon a verdict convicting defendant of the crimes of manslaughter in the second degree, conspiracy in the fifth degree and concealment of a human corpse.
On March 13, 2018, defendant rented a motel room where he, the victim and Jodi Noisseau spent the evening drinking alcohol and taking drugs. When it was time to check out the following morning, defendant and Noisseau were unable to wake the victim, and the two decided to carry the victim to defendant's car and transport her to Noisseau's apartment, where Noisseau would stay with the victim as she "sle[pt] it off." The victim died in that apartment, and her body was disposed of in the snow on the side of a residential street in the City of Albany. Defendant and Noisseau were subsequently arrested and charged with manslaughter in the second degree, tampering with physical evidence, conspiracy in the fifth degree and concealment of a human corpse. Noisseau pleaded guilty, and defendant proceeded to trial. A jury ultimately found defendant guilty on the manslaughter, concealment and conspiracy counts, and he was sentenced, as a second felony offender, to an aggregate prison term of 9½ to 19 years. He appeals, and we affirm.
Defendant challenges his convictions as unsupported by legally sufficient evidence and as against the weight of the evidence. Only defendant's legal sufficiency arguments regarding his manslaughter conviction were adequately preserved for our review,[FN1] and, as to that conviction, he argues that the People failed to prove his awareness that the victim was overdosing and that his conduct caused the victim's death. Nevertheless, as part of our weight of the evidence review, we necessarily assess whether each element of all three offenses, as charged in the indictment, was proven beyond a reasonable doubt (see People v Serrano, 200 AD3d 1340, 1341-1342 [2021]; People v Kabia, 190 AD3d 1105, 1106 [2021]).
"When assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether 'there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt'" (People v Lendof-Gonzalez, 36 NY3d 87, 91-92 [2020], quoting People v Danielson, 9 NY3d 342, 349 [2007]). When assessing whether a verdict is supported by the weight of the evidence, we must first determine whether, "based on all the credible evidence[,] a different finding would not have been unreasonable," and, if it would have been reasonable for the jury to reach a different conclusion, then we must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" to determine whether "the [jury] has failed to give the evidence the weight it should be accorded" (People v Bleakley, 69 [*2]NY2d 490, 495 [1987] [internal quotation marks and citation omitted]; see People v Romero, 7 NY3d 633, 643-644 [2006]).
As relevant here, "[a] person is guilty of manslaughter in the second degree when . . . [h]e [or she] recklessly causes the death of another person" (Penal Law § 125.15 [1]). For purposes of that offense, a person acts "[r]ecklessly" when he or she "is aware of and consciously disregards a substantial and unjustifiable risk" that death will occur, and "[t]he risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]). The defendant must be shown to have engaged "in some blameworthy conduct contributing to that risk" (People v Asaro, 21 NY3d 677, 684 [2013]; see People v Gaworecki, 37 NY3d 225, 230-231 [2021]; People v Acevedo, 187 AD3d 1030, 1032 [2020], lv denied 36 NY3d 1117 [2021]), and that "conduct must be the kind of seriously blameworthy carelessness whose seriousness would be apparent to anyone who shares the community's general sense of right and wrong" (People v Li, 34 NY3d 357, 364 [2019] [internal quotation marks and citations omitted]; see People v Lavalley, 158 AD3d 993, 994 [2018]; People v Crosby, 151 AD3d 1184, 1188 [2017]). "Although the awareness and corresponding disregard of [the] risk indeed is measured from the defendant's perspective, 'objective evidence of the surrounding circumstances may be weighed in making [that] factual determination'" (People v Briskin, 125 AD3d 1113, 1119 [2015], lv denied 25 NY3d 1069 [2015], quoting People v Licitra, 47 NY2d 554, 559 [1979]; see People v Marin, 164 AD3d 916, 918 [2018]).
As to defendant's other convictions, as limited by the People's indictment, "[a] person is guilty of concealment of a human corpse when, having a reasonable expectation that a human corpse . . . will be . . . used as physical evidence in . . . an examination by law enforcement personnel as part of a criminal investigation[,] such person, alone or in concert with another,
. . . alters . . . such corpse . . . with the intent to prevent its . . . use" (Penal Law § 195.02). Lastly, "[a] person is guilty of conspiracy in the fifth degree when, with intent that conduct constituting . . . a felony be performed" — here, concealment of a human corpse — "he [or she] agrees with one or more persons to engage in or cause the performance of such conduct" (Penal Law § 105.05 [1]).
Noisseau testified on behalf of the People at trial, pursuant to the terms of her plea agreement. She met defendant about a week prior to the subject incident, when she purchased crack from him. She met the victim for the first time on March 13, 2018, when the three were on their way to the motel. Noisseau had already smoked crack before she arrived, all three consumed alcohol once at the motel and, according to Noisseau, defendant also put "[l]ittle crystals," which she believed [*3]to be "[m]olly" or ecstasy, in their drinks. Defendant provided Noisseau with more crack, which she smoked in the bathroom. Noisseau later observed the victim in the bathroom with "four lines of heroin" on her cell phone. She declined the victim's offer to share in the heroin and exited the bathroom, claiming that she did not see the victim consume the heroin. She testified that defendant did not provide either woman with heroin that evening. Defendant and the victim later had sex, and the victim spent time in the bathroom thereafter before going to sleep. Noisseau then had sex with defendant in exchange for the crack that he had previously provided her. Noisseau also testified that there was a four-hour gap in her memory from that evening.
The next morning, defendant and Noisseau could not wake the victim for the 11:00 a.m. check out, and defendant accordingly dressed her, carried her to his vehicle and, upon Noisseau's suggestion, transported her to Noisseau's apartment, where Noisseau would watch her. During that process, housekeeping staff observed the victim, inquired as to her well-being and offered to call the police, but defendant and Noisseau stated in return that she was "just drunk." At trial, however, Noisseau testified that she did not believe the victim to be just drunk and "could tell something was definitely wrong" at that time.
Surveillance video from the motel captured the victim being brought to the vehicle by defendant. Her body appears lifeless, or "like a rag doll," as Noisseau described, and defendant has repeated difficulty keeping her off the ground. A white substance may also be seen on the victim's face. Noisseau testified that, every time that she had seen someone in the victim's state "nodd[ed] out," "[t]hey've come to." She also testified that she had never witnessed an overdose.
Defendant then drove the women to Noisseau's apartment. He helped get the victim into the apartment, placed her on a bed, sold crack to Noisseau's roommate, Christopher Kondracki, and then left. Noisseau testified that she and defendant did not discuss calling 911 or going to a hospital at any point prior to him leaving. Once at the apartment, Noisseau continued to check on the victim every hour, while she admittedly continued to smoke crack. She testified that the victim "seemed the same during that time," meaning "[u]nconscious." At one point, she heard the victim gurgling. Kondracki, who was "in and out" of the apartment that day, was also under the impression that the victim had "nodded out" and would "sleep [it] off," but he had also never witnessed an overdose. He heard the victim "snoring[,] and then her breathing changed [to] something like that of sleep apnea."
At about 4:00 p.m., Noisseau called defendant because she noticed the victim's "pulse was weakening" and "felt [that] he should know." According to Noisseau, she told defendant on a subsequent call that she wanted to call an ambulance for the victim [*4]and he responded that Noisseau should "let her rest." Instead of calling 911 herself, Noisseau called Floyd Highsmith, who she referred to as her drug dealer, and he came over not long thereafter.
At about 7:30 p.m., the victim's color changed, her lips turned purple and she vomited a black substance. Noisseau called defendant and told him that the victim "was gone." Defendant interpreted her statement to mean that the victim had left Noisseau's apartment, and Noisseau was required to explain, "[N]o she's dead." Defendant arrived soon thereafter with a white male that Noisseau did not know, later identified by defendant as "Jay," and Jay brought NARCAN, or naloxone, with him, although it is not clear that the narcotic inhibitor was ever administered. According to Noisseau, defendant then smashed the victim's cell phone and stated that she needed to be cleaned with bleach because his DNA was on her. Kondracki and Jay carried the victim to the bathroom, and Noisseau undressed her and washed her body with bleach.
Noisseau testified that defendant and Jay then left in defendant's car, and video evidence shows that this was around 10:50 p.m. The two returned with a truck about 20 minutes later according to the video. Evidence revealed that the truck was borrowed from Charles Wilke. Wilke testified that he was with "Big L" that evening, and Big L informed him that someone wanted to borrow the truck in return for crack. Wilke did not interact with the two men, one white and one black, that picked up the truck. When shown a picture of Valicia Rawlins, he confirmed that she was Big L. A state record containing Rawlins' cell phone number was admitted into evidence, and defendant's telephone records, also admitted into evidence, reveal multiple calls between his number and Rawlins' number from around 10:40 p.m. on the night in question. Noisseau went on to testify that defendant and Jay put the victim in the truck and left. The victim's body was discovered at around 11:30 p.m. atop a snowbank on the side of the street in a residential area. Various surveillance cameras captured the truck's trip from Noisseau's apartment to the spot where the victim's body would ultimately be discovered. Emergency medical services responded, at some point administered naloxone and the victim was officially pronounced dead at around 1:30 a.m.
The pathologist who performed the autopsy on the victim was able to confirm that the victim died from the combined toxicity of heroin, fentanyl and "N-ethyl-pentylone," a clandestine, consciousness-altering drug. She had naloxone and a breakdown product of cocaine, among other drugs, in her system as well, but there was no indication that the victim had taken molly or ecstasy. The pathologist testified that signs of drug toxicity include that the individual cannot be woken up, is making obstructed breathing sounds, such as snoring or gurgling, and has a reduced respiration rate. Another sign is foaming from the nose [*5]and/or mouth. The pathologist testified that the white discoloration seen on the victim's face in the motel surveillance video was foam, or its residue, as her lungs were full of the same. The pathologist also noted that any such residue wipes off the skin very easily. He explained that, at that point, the victim was essentially slowly drowning and that "almost nothing" other than consciousness-altering drugs causes foaming from the nose or mouth.
Defendant elected to testify on his own behalf, and he denied providing either Noisseau or the victim with any drugs on the night in question or observing either woman use any drugs. According to defendant, he wanted to bring the victim to her own residence, not Noisseau's, but not anywhere that professional medical attention would be provided. He denied seeing any foam coming from the victim's mouth and blamed a camera glitch for the appearance of white powder on her face. He stated that he believed the victim to be "having a hangover." According to defendant, he called Noisseau around 5:30 p.m., at which time he was left with the impression that the victim "was okay, . . . drinking water and . . . waking up." He was therefore confused by Noisseau's next call. He later arrived at the apartment with Jay and a NARCAN kit. According to defendant, he waited outside, wanting "no part of this," as Jay entered the apartment. When Jay reported that the victim was not breathing, defendant went inside and saw the victim with "black stuff on her nose and . . . mouth" and knew then that "something was wrong." He allegedly questioned Noisseau as to why she did not call 911, but did not call 911 himself. He denied suggesting the use of bleach, breaking the victim's cell phone, knowing Rawlins, borrowing a truck or moving the victim's body. Instead, he asserted that he visited one of Noisseau's neighbors and then later went to another friend's residence where they consumed drugs and played cards.
Turning to the legal sufficiency of defendant's manslaughter conviction, the People's theory centered on defendant's knowledge and conduct at the time that he and Noisseau transported the victim from the motel to Noisseau's apartment, where she was left without medical care for approximately 12 hours. Viewing the evidence in the light most favorable to the People, the proof at trial showed that defendant had observed the victim consume alcohol and drugs at the motel, that she could not be awakened the following morning, that he carried, with considerable difficulty, the victim's all-but-lifeless body out of the motel, that housekeeping staff believed help was needed upon observing the state that the victim was in and that the victim was foaming at the nose and/or mouth to some extent, presumably not long before she was moved, given that the foam residue had not yet rubbed off her face. That evidence provided a valid line of reasoning and permissible inferences from which a rational jury could conclude that [*6]defendant was aware of a "substantial and unjustifiable risk" to the victim's life (Penal Law § 15.05 [3]; see Penal Law § 125.15 [1]; CPL 60.22 [1]; see e.g. People v West, 166 AD3d 1080, 1085-1086 [2018], lv denied 32 NY3d 1129 [2018]; People v Roth, 141 AD3d 1090, 1091 [2016], lv denied 28 NY3d 936 [2016]; People v Peters, 126 AD3d 1029, 1031 [2015], lv denied 25 NY3d 991 [2015]).
As to causation, "[s]ufficiently direct causation is established by proof of the following: (1) that [the] defendant's actions were an actual contributory cause of the death, in the sense that they forged a link in the chain of causes which actually brought about the death; and (2) that the fatal result was reasonably foreseeable" (People v Davis, 28 NY3d 294, 300 [2016] [internal quotation marks, brackets and citations omitted]). Viewing the evidence in the light most favorable to the People, the proof showed that defendant represented to motel staff, who again believed the victim was in need of help, that the victim was merely drunk or hungover in an attempt to assuage their concern and prevent them from calling the police. Defendant instead elected to transport the victim to Noisseau's apartment, "a location that made her less likely to obtain medical assistance" (People v Erb, 70 AD3d 1380, 1381 [2010], lv denied 14 NY3d 840 [2010]). Defendant knew that the only care the victim would receive at the apartment would be from Noisseau, who had herself consumed a significant quantity of drugs and alcohol the prior evening. It was also by no means unexpected that Noisseau would continue to take drugs and/or drink alcohol once at her apartment, where defendant sold crack to her roommate, and that her self-professed ability to care for a person in the victim's condition would be diminished. Based on the evidence cited above concerning the victim's condition, the People also set forth prima facie proof that the victim's death was reasonably related to the foregoing conduct and therefore foreseeable. "It is not required that [her] death was the inevitable result or even the most likely result" of defendant's conduct (CJI2d[NY] Causation — Cause of Death), and the proof was legally sufficient to demonstrate that defendant's conduct "set in motion the events which [would] ultimately result in the victim's death" (People v Li, 34 NY3d at 369 [internal quotation marks and citation omitted]).
The jury's verdict was also supported by the weight of the credible evidence. As to his manslaughter conviction, in our view, another verdict would have been unreasonable. In attempts to diminish his culpability, defendant cites an alleged lack of familiarity with overdoses and an alleged lack of knowledge that the victim was using any drugs on the night in question, insisting that, if anything, his conduct was merely criminally negligent (see generally People v Gaworecki, 37 NY3d at 230-232). Irrespective of the specific substance that induced the victim's state or who provided [*7]it, it is painfully apparent from the video evidence admitted at trial that she required prompt medical attention upon leaving the motel. This is not a case where a defendant's awareness was limited to "the general knowledge of the injuriousness of drug-taking" (People v Cruciani, 36 NY2d 304, 305 [1975]). Defendant was aware of the nature of the gathering on the prior evening and then witnessed the victim's condition firsthand the following morning, and his failure at that point, and at multiple points thereafter, to seek out or accept assistance in obtaining that help was a gross deviation from what a reasonable person would have done in the circumstance. Indeed, any lack of experience or knowledge as alleged by defendant should have only heightened his concern for the victim under the circumstances, and his alleged reliance on Noisseau's "expertise" does not negate the foregoing (see People v Peters, 126 AD3d at 1031). There is therefore no basis upon which to disturb the manslaughter conviction (see Penal Law §§ 15.05 [3]; 125.15 [1]; CPL 60.22 [1]).
Another verdict would not have been unreasonable on the concealment and conspiracy convictions given that a jury could have chosen to accept defendant's version of events as to what transpired after the victim's death, but they did not. According deference to the jury's credibility determinations, we find that these two convictions are also supported by the weight of the evidence (see Penal Law §§ 105.05 [1]; 195.02).[FN2]
Turning to the evidentiary errors alleged by defendant, we first find that Supreme Court providently exercised its discretion in permitting the People to introduce evidence of defendant's drug sales to Kondracki and Wilke to complete the narrative of events (see People v Richardson, 162 AD3d 1328, 1331 [2018], lv denied 32 NY3d 1128 [2018]; compare People v Wilkinson, 71 AD3d 249, 255-256 [2010]). Additionally, defendant failed to request a Molineux instruction from the court with respect to Wilke, and his challenge to that end is therefore unpreserved for our review (see People v Abussalam, 196 AD3d 1000, 1008 [2021], lv denied 37 NY3d 1144 [2021]; People v Williams, 107 AD3d 1516, 1516 [2013], lv denied 21 NY3d 1047 [2013]). We note that the jury was provided with a lengthy Molineux instruction at the close of proof with respect to the proper use of several other uncharged crimes.
Defendant's argument that he should have been permitted to testify as to Noisseau's exact words during their phone calls in order to establish his state of mind is also unpreserved as defendant never proffered a basis for the admissibility of that evidence upon the People's objections (see People v George, 67 NY2d 817, 818-819 [1986]; People v Pascuzzi, 173 AD3d 1367, 1377 [2019], lv denied 34 NY3d 953 [2019]; People v Natal, 94 AD3d 619, 619 [2012], lv denied 19 NY3d 976 [2012]). In any event, defendant was in fact able to testify as to what Noisseau told him on their calls, and he was further [*8]able to explain his general impression of the victim's condition by the end of the alleged 5:30 p.m. call. We also observe that Supreme Court did not formally strike any of defendant's objected-to remarks from the record or expressly direct the jury to disregard same. Defendant's arguments concerning the admissibility of Wilke's identification of Rawlins and the state record establishing Rawlins' cell phone number are similarly unpreserved (see CPL 470.15).
Defendant's claim that he was deprived of his right to a fair trial due to prosecutorial misconduct is also unpreserved as he failed to lodge objections to the remarks that he now challenges (see People v Lyons, 200 AD3d 1222, 1226 [2021], lv denied 37 NY3d 1162 [2022]; People v Smith, 193 AD3d 1260, 1266 [2021], lv denied 37 NY3d 968 [2021]; People v Johnson, 183 AD3d 77, 89 [2020], lv denied 35 NY3d 993 [2020]). To the extent that this claim underlies the ineffective assistance of counsel claim that follows, we find that it is also meritless. Defendant is correct, and the People now concede, that, during defendant's cross-examination and to some extent the People's summation, the prosecutor failed to appreciate that certain communications between defendant and Noisseau — as reflected in the detailed, voluminous call logs admitted into evidence — were text messages rather than phone calls. That said, communications between the two did occur at the times identified by the prosecutor, and defendant testified that he had woken up from a nap to a slew of missed calls and texts from Noisseau such that any inadvertent misrepresentation was not so misleading as to deprive defendant of his right to a fair trial (see People v Lawrence, 141 AD3d 828, 833-834 [2016], lvs denied 28 NY3d 1071, 1073 [2016]; compare People v Wright, 25 NY3d 769, 771, 780-784 [2015]; People v Powell, 165 AD3d 842, 843-844 [2018]; People v Cotton, 242 AD2d 638, 638-639 [1997]). In addition, to the extent that a remark by the prosecutor suggested to the jury that it was to determine whether defendant was proven guilty or proven not guilty, and therefore impermissibly shifted the burden of proof onto defendant (see generally People v Goldston, 126 AD3d 1175, 1180 [2015], lv denied 25 NY3d 1201 [2015]), the record reflects that the prosecutor reminded the jury that the People alone carried the burden of proving defendant's guilt, and, more to the point, that remark did not rise to the flagrant and pervasive level of misconduct that would warrant reversal (see People v Harris, 162 AD3d 1240, 1244 [2018], lv denied 32 NY3d 937 [2018]; People v Ressy, 141 AD3d 839, 842-843 [2016], lvs denied 28 NY3d 1030 [2016]).
Defendant next contends that he was deprived of his right to the effective assistance of counsel — specifically, that counsel was ineffective for failing to preserve all of the aforementioned unpreserved arguments and failing to request missing witness charges as to Rawlins and Highsmith and an accomplice testimony [*9]charge as to Kondracki. The first aspect of his claim is unavailing as the arguments cited to by defendant were ultimately lacking in merit such that timely objections would have had little or no chance of success (see People v Rose, 185 AD3d 1228, 1232 [2020], lv denied 35 NY3d 1115 [2020]; People v Brown, 169 AD3d 1258, 1260 [2019], lv denied 33 NY3d 1029 [2019]; People v Richardson, 162 AD3d 1328, 1332 [2018], lv denied 32 NY3d 1128 [2018]). Similarly, defendant has not shown that either Rawlins or Highsmith were under the People's control, or that Highsmith would have offered any noncumulative testimony so as to warrant the jury charges that he now seeks (see People v Smith, 33 NY3d 454, 458-459 [2019]; People v Ferguson, 193 AD3d 1253, 1259-1260 [2021], lv denied 37 NY3d 964 [2021]; People v Hamilton, 176 AD3d 1505, 1509 [2019], lvs denied 34 NY3d 1126, 1128 [2020]). Assuming without deciding that Kondracki was an accomplice within the meaning of CPL 60.22 (see generally People v Sage, 23 NY3d 16, 23-24 [2014]), there are a number of possible strategic reasons for declining to request a charge concerning such status (see e.g. People v Porter, 82 AD3d 1412, 1416 [2011], lv denied 16 NY3d 898 [2011]; People v Smith-Merced, 50 AD3d 259, 259 [2008], lv denied 10 NY3d 939 [2008]; People v Leffler, 13 AD3d 164, 164-165 [2004], lv denied 4 NY3d 800 [2005]). Upon a review of the record, we are satisfied that defendant received meaningful representation.
We lastly reject defendant's argument that his aggregate sentence is harsh and excessive. Defendant received the maximum permissible terms for his convictions (see Penal Law § 70.06 [3] [c], [e]; [4] [b]), and the consecutive manner in which the sentences were imposed was lawful (see Penal Law § 70.25). Supreme Court considered defendant's extensive criminal history, his lack of remorse and the multiple victim impact statements in fashioning its sentence, and we agree with the court that defendant's actions were completely devoid of any human sympathy or concern. We discern no basis upon which to disturb the aggregate sentence.
Garry, P.J., Aarons and Colangelo, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Defendant did challenge the legal sufficiency of each offense in his motion for a trial order of dismissal and his renewed motion thereafter, but he did not include the arguments he now raises with respect to his concealment and conspiracy convictions (see People v Serrano, 200 AD3d 1340, 1341 [2021]; People v Kabia, 190 AD3d 1105, 1106 [2021]).

Footnote 2: Defendant failed to preserve his argument that the jury rendered an inconsistent verdict in acquitting him on the tampering count but convicting him on the concealment count, as he failed to lodge an appropriate objection to that end before the jury was discharged (see People v Agudio, 194 AD3d 1270, 1275 [2021]; People v Coville, 73 AD3d 1232, 1232-1233 [2010]).