People v Crispell (2024 NY Slip Op 00004)

People v Crispell

2024 NY Slip Op 00004

Decided on January 4, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:January 4, 2024

113475
[*1]The People of the State of New York, Respondent,
v
Autumn J. Crispell, Appellant.

Calendar Date:November 17, 2023

Before:Garry, P.J., Egan Jr., Aarons, Pritzker and Reynolds Fitzgerald, JJ.

Paul J. Connolly, Delmar, for appellant.
Matthew Van Houten, District Attorney, Ithaca (Emily Perks Quinlan of counsel), for respondent.

Pritzker, J.
Appeal from a judgment of the County Court of Tompkins County (John C. Rowley, J.), rendered February 8, 2022, upon a verdict convicting defendant of the crimes of criminal possession of a weapon in the third degree and criminal possession of stolen property in the fourth degree.
Defendant was charged by indictment with the crimes of criminal possession of a weapon in the third degree and criminal possession of stolen property in the fourth degree stemming from the possession of a stolen handgun which was discovered while a police officer was searching defendant's residence looking for her sister. Defendant moved to suppress both physical evidence and statements based upon an argument that the police officer's entry into her residence was illegal and, thus, the physical evidence and statements were fruit of the poisonous tree. After a hearing, County Court denied defendant's suppression motion. Defendant was then convicted, after a jury trial, as charged and was sentenced to a five-year term of probation. Defendant appeals.
Defendant argues that County Court erred in denying her motion to suppress the handgun as well as her statements. Significant to this argument is the court's finding that the entry of two police officers into defendant's residence was indeed illegal, given that they entered through a door on the first floor and then proceeded up a flight of stairs to knock on a second door, which defendant answered. The court's basis for this finding was that the stairway was accessible only to defendant and, thus, it was part of her residence. There is no dispute that the police officers did not receive consent for this warrantless entry through this first door. The court went on to hold that, although this initial entry was illegal, after the officers knocked on the second door at the top of the stairwell, defendant voluntarily consented to the search of her residence, which attenuated the search from the illegal entry such that suppression was not required. Defendant contends that County Court erred as defendant's consent was not voluntary and, if it was, it did not attenuate the search from the illegal entry.
We turn first to the issue of whether defendant's consent was voluntary. "Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in the light of all the circumstances" (Schneckloth v Bustamonte, 412 US 218, 221 [1973] [internal quotation marks and citation omitted]; see People v Gonzalez, 39 NY2d 122, 128 [1976]). " 'Factors for the court to consider include (1) whether consent was given while the individual was in police custody, how many officers were present on the scene, and whether the individual was handcuffed; (2) the personal background of the individual, including his or her age and prior experience with the law; (3) whether the individual offered resistance or was cooperative; and (4) whether [*2]the police advised the individual of his or her right to refuse consent" (People v Hill, 153 AD3d 413, 417 [1st Dept 2017] [citations omitted], affd 33 NY3d 1076 [2019]; accord People v Brinkley, 174 AD3d 1159, 1163 [3d Dept 2019], lv denied 34 NY3d 979 [2019]). "The People bear the 'heavy burden' of establishing that consent was indeed voluntary" (People v Brinkley, 174 AD3d at 1163, quoting People v Gonzalez, 39 NY2d at 128). "The suppression court's credibility determinations are entitled to great deference on the question of voluntariness, unless they were manifestly erroneous or plainly unjustified by the evidence" (People v Hill, 153 AD3d at 417 [citations omitted]; see People v Robinson, 156 AD3d 1123, 1129 [3d Dept 2017], lv denied 30 NY3d 1119 [2018]).
Testimony at the hearing established that, during a traffic stop, Kyle Steiner, a state trooper, was informed that defendant's sister, for whom there were outstanding warrants, was at defendant's residence. Upon learning this, Steiner as well as Dana Smith, a police officer with the Village of Dryden, Tompkins County, and Michael Howard, a patrol officer from Tompkins Cortland Community College, went to defendant's residence in an attempt to locate the sister. Howard remained outside, watching the rear of the building, while Steiner and Smith went into the residence by entering through the first-floor door. They proceeded up the stairs and knocked on defendant's door, which Smith, from prior encounters with defendant, knew separated the stairwell from defendant's living room. When defendant answered the door, she asked why they didn't knock or ring the doorbell on the first floor. After telling her that the bottom door was open and that Smith knew that there would be a second door, defendant asked why they were there and was told that there was "reason to believe" that defendant's sister was in her apartment. Steiner asked for permission to search, which defendant denied, stating that Steiner could not come in as she did not have a good history with troopers, but that Smith could come in and conduct a search. Smith testified that he confirmed with defendant that it was okay for him to enter and conduct a search and she stated that it was. Smith testified that, during the search, he was in a closet area moving around piles of clothes to ensure no one was hiding underneath them when he observed an open safe with a handgun in plain view. Smith informed Steiner that he found the handgun and Steiner informed Howard of same. Howard then entered defendant's residence and defendant's interactions with him, as well as the other law enforcement, were recorded on a body camera worn by Howard. This footage was admitted into evidence at the hearing. The body camera footage shows that when Howard entered the residence defendant was standing in her living room with one foot, which was in a medical boot, up on her coffee table, with an annoyed look on her face. She immediately began joking with Howard, laughing [*3]as she said she had to get her son. She then joked with both Howard and Smith about their prior involvement with her and also stated that she was "cocky" because she was off probation so she wanted to fight with everybody. Defendant also told Howard about another time the police were "lined up the block" looking for her sister, but that time her sister was in her residence and defendant refused to open the door. After the officers told defendant that she was going to be arrested for possessing a stolen handgun, defendant exclaimed, "I'm nice to you, I let you in my crib and now this is what I get."
Defendant testified that the day of the incident she was six months pregnant and had a broken foot. She was at home when a friend informed her that he had sent the police to defendant's residence to look for the sister. She testified that she did not intend to let the police into her residence because the sister wasn't there. Defendant explained that, when the police knocked on her door, she was on the phone trying to locate the sister for the police as she hoped that if the sister went to jail she would stop using drugs. When defendant opened the door, she asked Steiner and Smith why they didn't ring the bell or knock on the door. She testified that Steiner shrugged, and Smith said the door was open. Defendant testified that she felt violated. Defendant was informed that Steiner and Smith were looking for her sister and she told them that her sister wasn't there. Defendant testified that she told Steiner and Smith that she was not going to let them into her home and that she was going to try to help them locate the sister. They asked again and, because she needed to go and pick up her son from school, she said that Smith could come in and search as it seemed like the easiest way to get the officers to go away. Defendant testified that she stayed with Steiner while Smith searched her home. She explained that Smith found the handgun while he was searching in a spare bedroom she uses for a walk-in closet.
Given the foregoing, County Court did not err in finding that defendant had voluntarily consented to the search of her residence. No witness, including defendant, testified to any coercion or intimidation by the police officers. In fact, defendant testified that she agreed to let the police officer search her residence because it seemed like the easiest way to get them to leave. It was clear from the interactions between defendant and Howard, Smith and Steiner that she was very comfortable with law enforcement. Although the officers did not inform her that she did not have to consent to the search (see People v Brinkley, 174 AD3d at 1164), it is clear that defendant was aware of this as, in the past when her sister was in her apartment, she refused law enforcement entry. Moreover, the day of the incident she refused to let Steiner in, only agreeing to give consent to Smith. Defendant also, multiple times, touted that she had past experience with law enforcement[*4], even joking about being "cocky." Although, in defendant's brief, she references being pregnant and having a broken foot on the day of the incident as reasons that her consent was not voluntary, it is clear from the video footage that neither of these conditions physically hindered her as she walked around and even descended stairs without issue. There is simply no evidence in the record that defendant's consent to search was not voluntary, including from defendant's own testimony (see generally People v Brinkley, 174 AD3d at 1164; People v Hill, 153 AD3d at 417).
Inasmuch as defendant's consent to search was voluntary, we now turn to defendant's contention that the voluntary consent did not attenuate the search from the illegal entry. "Under well-established exclusionary rule principles, where police have engaged in unlawful activity . . . evidence which is a result of the exploitation of that illegality is subject to suppression as the fruit of the poisonous tree unless one of the recognized exceptions to the exclusionary rule is applicable" (People v Small, 110 AD3d 1138, 1140 [3d Dept 2013] [internal quotation marks and citations omitted]; see People v Borges, 69 NY2d 1031, 1033 [1987]). Attenuation, the exception at issue here, focuses "on the presence or absence of free will or voluntariness regarding a defendant's acts which follow illegal police conduct; thus, the attenuation inquiry resolves whether the causal connection between the police misconduct and the later discovery of the challenged evidence is so far removed as to dissipate the taint" (People v Small, 110 AD3d at 1140 [internal quotation marks, ellipsis and citation omitted]). "In deciding whether voluntary consent attenuated the taint of illegal police action, a court must give consideration to a variety of factors, including the temporal proximity of the consent to the illegal police action, the presence or absence of intervening circumstances, whether the police purpose underlying the illegality was to obtain the consent or the fruits of the search, whether the consent was volunteered or requested, whether the defendant was aware he [or she] could decline to consent, and particularly, the purpose and flagrancy of the official misconduct" (Matter of Leroy M., 16 NY3d 243, 246 [2011] [internal quotation marks, brackets and citations omitted], cert denied 565 US 842 [2011]; see People v Small, 110 AD3d at 1140). "Such factors enable the court to decide 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint' " (Matter of Leroy M., 16 NY3d at 246, quoting Brown v Illinois, 422 US 590, 599 [1975]).
Here, there is no dispute that the voluntary consent occurred only moments after the illegal entry into defendant's stairwell. However, this factor "is not dispositive of attenuation here, particularly [*5]where the person giving the consent is not the subject of the police action" (Matter of Leroy M., 16 NY3d at 247). Additionally, although consent was requested rather than volunteered (compare Matter of Leroy M., 16 NY3d at 247), it is abundantly clear that defendant was well aware that she could decline consent. Moreover, as County Court aptly indicated in its decision, it was not articulated why the officers illegally entered the stairwell but the court surmised that "it was likely related to . . . Smith's knowledge that there was a second entry door at the top of the stairs and their hope was to maintain some element of surprise in searching for a fugitive" rather than to acquire defendant's consent. This is supported not only by the lack of testimony regarding any bad faith by the officers at the hearing (see People v Bradford, 15 NY3d 329, 334 [2010]; compare People v Sweat, 170 AD3d 1659, 1661 [4th Dept 2019]), but also by, as shown in the body camera footage, the placement of Howard in the backyard of the house to ensure that no one fled from the residence, given that defendant's sister had a history of being a "runner." Finally, although it does not purge the illegality of the officers' entrance into the stairwell of defendant's apartment, it is relevant to the attenuation analysis that there was a second door at the top of the stairway separating the interior of defendant's apartment. This is not a case where police officers entered directly into the main area of defendant's apartment and began searching, but rather they had to stop, knock and seek consent from defendant prior to entering the main living area of the apartment (compare People v Sweat, 170 AD3d at 1659-1660). Thus, given that there "was no evidence that the illegal entry was undertaken for the purpose of obtaining consent or seizing the fruits of the search . . . , the alleged police misconduct here — walking through an unlocked [first floor] door into a [stairwell], before knocking on an interior door — is not so flagrantly intrusive on personal privacy that its taint cannot be dissipated" (Matter of Leroy M., 16 NY3d at 247). Accordingly, the handgun was recovered "by means sufficiently distinguishable to be purged of the primary taint" (Brown v Illinois, 422 US at 599 [internal quotation marks and citations omitted]; accord Matter of Leroy M., 16 NY3d at 246; see also People v Bradford, 15 NY3d at 333-335; People v Espinal, 161 AD3d 556, 558 [1st Dept 2018], lv denied 32 NY3d 1064 [2018]) and, as such, County Court did not err in denying defendant's suppression motion.
Garry, P.J., Egan Jr., Aarons and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed.