People v Williams (2025 NY Slip Op 03605)

People v Williams

2025 NY Slip Op 03605

Decided on June 12, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 12, 2025

113569
[*1]The People of the State of New York, Respondent,
v
Lee Williams, Appellant.

Calendar Date:April 23, 2025

Before:Clark, J.P., Aarons, Ceresia, Fisher and McShan, JJ.

Matthew C. Hug, Albany, for appellant.
Lee C. Kindlon, District Attorney, Albany (Emily Schultz of counsel), for respondent.

Ceresia, J.
Appeal from a judgment of the County Court of Albany County (Andra Ackerman, J.), rendered May 13, 2022, upon a verdict convicting defendant of the crime of murder in the second degree.
Just before midnight on January 5, 2020, the police were called to an apartment in the City of Albany, where the body of the tenant — a 62-year-old woman who lived alone and was recovering from recent triple bypass surgery — was found on the floor, having been severely beaten and strangled. The victim had a home health aide, Quineasha Anderson, who lived in another apartment in the same building along with defendant, her boyfriend of a few weeks. Following an investigation, the police arrested defendant and he was indicted on a single count of murder in the second degree. After a jury trial, defendant was convicted as charged and sentenced to a prison term of 25 years to life. Defendant appeals.
We turn first to defendant's arguments that the verdict is unsupported by legally sufficient evidence, and is against the weight of the evidence, because the People failed to prove that it was he and not Anderson who murdered the victim. "When assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (People v Harris, 203 AD3d 1320, 1321 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1033 [2022]). "When undertaking a weight of the evidence review, this Court must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then it must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Saunders, 232 AD3d 1039, 1040 [3d Dept 2024] [internal quotation marks and citations omitted]). In weighing the evidence, we "must afford deference to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor," although we are also required "to independently assess all of the proof and to serve, in effect, as a second jury" (People v Baque, 43 NY3d 26, 29-30 [2024] [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]). "A person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]).
The evidence at trial revealed the following. On January 2, 2020, a neighboring tenant found the victim in a disoriented state and brought her to Anderson's apartment. While trying to help the victim locate her keys, Anderson discovered a large sum of cash that the victim was carrying in her distinctive red [*2]purse. Anderson counted the money and determined that the victim had approximately $1,600. Anderson made a plan with the victim to go to the bank on January 4 to deposit the money. Defendant was present in Anderson's apartment at the time and witnessed this interaction.
At approximately 7:00 a.m. on January 4, 2020, Anderson spoke to the victim on the phone to confirm their plan to go to the bank at 2:00 p.m. that day. Around 11:00 a.m. or 12:00 p.m., Anderson asked defendant to purchase lunch for the victim and bring it to her apartment. Defendant went out and returned some time later, stating that he had gotten into an argument with the victim over the beef patties he had brought her for lunch. According to Anderson, defendant appeared to be sweating profusely and was out of breath. He was acting erratically, refusing to answer Anderson's questions, and appeared to be high on cocaine. Defendant changed his clothes around the time of his return. Anderson tried to contact the victim at approximately 1:30 p.m. in advance of their planned trip to the bank, but was not able to get in touch with her. That afternoon, Anderson reached out to the victim's son to let him know that she had been unable to contact the victim.
The next day, January 5, 2020, the victim's son went to the victim's apartment to check on her, where he discovered her body and called the police. Upon arrival, the police observed what appeared to be blood spatter on the floor and walls near the victim's body and a plastic bag on her bed containing beef patties, one of which was partially eaten.
Surveillance video obtained from the apartment building showed defendant exiting and reentering the building several times on January 4, 2020, wearing a blue hooded sweatshirt and jeans. As the afternoon went on, defendant was seen on the video carrying a black backpack. There was evidence presented that, on that same day, a person wearing a blue hooded sweatshirt and jeans approached a stranger on the street and tried unsuccessfully to sell him items contained in a dark-colored backpack, including multiple electronic devices and a ring. A precious metals dealer testified that, later in the evening on January 4, he purchased a gold ring from a person named Lee, wearing a black backpack. Although the ring was later melted down and could not be recovered, the police found a photograph taken with and stored on defendant's cell phone that evening which depicted a gold ring, and the victim's son identified it as the victim's engagement ring. A black backpack containing electronics belonging to the victim was eventually discovered in a trash can in the neighborhood.
The People also presented testimony concerning DNA evidence. The day after the victim's body was found, the police searched a trash compactor in the basement of the apartment building and discovered the victim's red purse beside men's clothing consisting of a blue hooded sweatshirt and a pair of jeans that appeared to be spattered with [*3]blood. It was determined that it was the victim's blood that was on the jeans. A forensic consultant testified that because the blood was in a spatter pattern, the jeans would have had to be in direct proximity to the victim when her blood was spattered onto them. Defendant was found to be a major contributor of DNA collected from those jeans, while the blue sweatshirt contained both defendant's and the victim's DNA. It was also determined that a bloody footprint left at the scene had consistent features with a particular brand of boots, that defendant was seen on surveillance video wearing a pair of boots which appeared to be of that brand and that, when asked by the police about the boots he was wearing that day, defendant said he had since given them away.
A pathologist who conducted an autopsy determined that the cause of death was extensive blunt force trauma throughout the body, with strangulation not discounted as a possible cause. Among other injuries, the victim had sustained broken bones in her neck as well as eight broken ribs, a laceration through her lip, traumatic hemorrhages to the scalp, face and neck, and ligature marks on the neck. During the autopsy, the victim was found to have $1,100 in cash secreted in her undergarments.
For his part, defendant testified that Anderson beat the victim while defendant tried in vain to stop her. Defendant admitted to throwing away the clothes he was wearing, but said that he did so at Anderson's direction because she noticed blood on them. According to defendant, Anderson also told him to take the victim's belongings and try to sell them, and she ordered him not to return with them. Defendant admitted that he had never named Anderson as the perpetrator prior to trial, that he had lied to the police and grand jury throughout the investigation and that he had deleted incriminating evidence from his phone. In addition to his trial testimony, the jury had the opportunity to view a lengthy video of his police interview and to hear his grand jury testimony read into the record, in which defendant gave versions of events that differed from each other and from the version he provided at trial. From defendant, the jury learned that he was primarily living off an $820 monthly disability check, that he received his check on January 1, 2020 and that he had spent all but $60 or $70 of it by January 4. Defendant also testified that he was a fitness trainer who stayed in shape and trained with a heavy punching bag.
The foregoing evidence, viewed in the light most favorable to the People, is legally sufficient to establish defendant's identity as the perpetrator of the murder (see People v Grady, 233 AD3d 1369, 1371-1372 [3d Dept 2024], lv denied 43 NY3d 963 [2025]; People v Quinn, 210 AD3d 1284, 1285 [3d Dept 2022], lv denied 39 NY3d 1079 [2023]). That is, the proof demonstrated that defendant, who apparently had little money, was aware that the victim was in possession of a large amount of cash; defendant [*4]was observed entering and leaving the apartment building on the day in question and, indeed, was in the victim's apartment; defendant's clothing was spattered with the victim's blood; and defendant attempted to sell the victim's personal belongings shortly thereafter.
As for the weight of the evidence, a different verdict would not have been unreasonable. Defendant testified that Anderson was the killer, and there was other evidence that could arguably point to her guilt, including the presence of her DNA in the victim's apartment, the fact that she injured her knee on the day of the victim's death, and her hesitancy in cooperating with police. Still, deferring to the jury's credibility determinations while weighing the proof in a neutral light, we find that the verdict is supported by the weight of the evidence. In that regard, mindful that this is a wholly circumstantial case, we are satisfied "that 'the inference of [defendant's] guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence' " (People v Baque, 43 NY3d at 30, quoting People v Sanchez, 61 NY2d 1022, 1024 [1984]; cf. People v Warr, 237 AD3d 1262, 1266 [3d Dept 2025]; People v Moore, 223 AD3d 1085, 1093 [3d Dept 2024], lv denied 41 NY3d 1003 [2024]).
Next, defendant argues that he was subjected to a warrantless arrest without probable cause when he was brought to the police station for questioning in the late evening on January 6, 2020, such that statements he made that night, as well as the contents of his cell phone and DNA evidence obtained from a buccal swab, should have been suppressed as the fruit of the poisonous tree (see People v Tyrell, 82 AD3d 1352, 1353 [3d Dept 2011], lv denied 17 NY3d 810 [2011]). Initially, we note that, after being held and questioned overnight at the police station, defendant was released, and he was not formally arrested and charged with murder until the following April. Nevertheless, as the People concede, defendant was subjected to a de facto arrest on January 6, triggering the requirement of probable cause (see People v Baptiste, 306 AD2d 562, 566 [3d Dept 2003], lv denied 1 NY3d 594 [2004]; see generally People v Hicks, 68 NY2d 234, 240 [1986]; People v Tyrell, 82 AD3d at 1354).
Probable cause "merely [requires] information sufficient to support a reasonable belief that an offense has been committed by the person arrested" (People v Shulman, 6 NY3d 1, 25 [2005] [internal quotation marks, ellipsis and citation omitted], cert denied 547 US 1043 [2006]; see People v Cooper, 196 AD3d 855, 856 [3d Dept 2021], lv denied 37 NY3d 1160 [2022]). According to suppression hearing evidence, prior to defendant's detention, the police knew the specifics of the victim's injuries. Further, the police had spoken to Anderson and learned that defendant was aware of the large amount of cash in the victim's possession. By this point, the police had knowledge [*5]that defendant was the last known person to see the victim alive when he brought lunch to her — specifically, the beef patties that were observed by the police on her bed. Anderson had also described to the police defendant's suspicious behavior upon returning from that errand. In addition, law enforcement had located the victim's purse, along with the blood-spattered men's clothing, in the trash compactor. Detectives had viewed the surveillance video showing a person wearing that clothing exiting and reentering the building, and they had determined that this person had used Anderson's swipe card to get in and out. The foregoing facts, taken together, were sufficient to supply the requisite probable cause for defendant's de facto arrest (see People v Shulman, 6 NY3d at 26; People v Parker, 127 AD3d 1425, 1428-1429 [3d Dept 2015]; People v Weishaupt, 118 AD3d 1100, 1103 [3d Dept 2014]).
As for defendant's further argument regarding the buccal swab — that his consent to provide the same was coerced — we are unpersuaded. " 'Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in the light of all the circumstances' " (People v Crispell, 223 AD3d 941, 942 [3d Dept 2024] [citation omitted], lv denied 41 NY3d 964 [2024], quoting Schneckloth v Bustamonte, 412 US 218, 221 [1973]). Factors to be considered include whether the defendant was in police custody, the number of officers present, and the presence or absence of restraints; the personal background of the defendant, including age and prior experience with the law; whether the defendant was cooperative or resistant; and whether the defendant was advised of the right to refuse consent (see People v Gonzalez, 39 NY2d 122, 128-130 [1976]; People v Tucker, 149 AD3d 1261, 1263 [3d Dept 2017], lv denied 29 NY3d 1087 [2017]; People v Dail, 69 AD3d 873, 874 [2d Dept 2010], lv denied 14 NY3d 839 [2010]).
Here, it is true that defendant was in police custody, multiple officers were present over the course of the interview and he was shackled. However, defendant had experience with the criminal justice system, as evidenced by the fact that he told the police that his DNA had been collected before. Defendant was asked on three separate occasions whether he would consent to a buccal swab, and he readily agreed each time. Upon subsequently being presented with a written consent form, defendant was advised that he did not have to sign it, that no one was forcing him to sign it and that it was his decision to make. After asking some clarifying questions as to the consequences of executing the form, defendant signed it. While certain comments made by a detective during this discussion may have been better left unsaid, defendant had already provided verbal consent three times by that point, and a review of the video of defendant's interactions with the police satisfies us that the People [*6]met their burden of showing that defendant's consent was voluntarily provided and his free will was not overborne (see People v Crispell, 223 AD3d at 945; People v Brinkley, 174 AD3d 1159, 1164 [3d Dept 2019], lv denied 34 NY3d 979 [2019]).
Finally, defendant's remaining contentions concerning purported errors in the presentation of the case to the grand jury have been considered and found to be meritless.
Clark, J.P., Aarons, Fisher and McShan, JJ., concur.
ORDERED that the judgment is affirmed.